ANGELO TOMASSO, INC. *v.* ARMOR CONSTRUCTION & PAVING, INC., ET AL.

ASHLAND OIL COMPANY, INC. *v.* ARMOR CONSTRUCTION & PAVING, INC., ET AL.

HEALEY, PARSKEY, ARMENTANO, SHEA and BORDEN, Js.

---

Argued April 8—decision released July 13, 1982

*Edward G. Pizzella,* with whom, on the brief, was *Sidney L. Rosenblatt,* for the appellants (third party plaintiffs).

*R. Bradley Wolfe,* for the appellee (third party defendant).

ARTHUR H. HEALEY, J. These two companion cases were referred to the state referee for hearing and judgment by the Superior Court. In April, 1974, the defendant, Armor Construction & Paving,

Inc. (Armor), applied for and was granted by the plaintiffs, Angelo Tomasso, Inc. (Tomasso) and Ashland Oil Company, Inc. (Ashland), a line of credit for the purchase of materials to be used in its business as a paving contractor. The plaintiffs required the defendants Mario Leo and John Wentworth, the president and secretary-treasurer of Armor, respectively, to guarantee personally payment of the accounts plus all costs of collection, including reasonable attorney's fees and interest on any delinquent balance.

In 1975, Armor ordered and received amounts of bituminous concrete and crushed stone from Tomasso and Ashland at prices of $7490.78 and $5054.23, respectively. Armor experienced financial difficulties and ceased operations in February, 1976 without making any payments on these accounts. The plaintiffs instituted suit against Armor and the individual defendants, Leo and Wentworth, as guarantors. The Superior Court rendered summary judgment in favor of the plaintiffs as to liability only and a hearing was subsequently held on the issue of damages. As a result of this hearing, Leo and Wentworth were held liable for the principal sum of these accounts plus interest, attorney's fees, and costs.

While these cases were pending, the defendants Wentworth and Leo, as third party plaintiffs, with the permission of the court, in each case impleaded a third party defendant, Pierre C. Lemieux, alleging that Armor was in reality a sole proprietorship owned, controlled and operated by the third party defendant, Lemieux, and was the alter ego of said third party defendant and that he "is or may be liable to the third party Plaintiffs" for the amount of the claims alleged in the principal action in each

case. To this third party complaint, the third party defendant pleaded by way of a denial, special defense and a counterclaim.

Pursuant to Practice Book § 302, the third party defendant moved for a judgment of dismissal of the third party complaint for failure to make out a prima facie case. The referee granted the motion and stated: "[i]t is found and concluded, in each case, that the cause of action alleged by the third party plaintifs [sic], Wentworth and Leo, against the third party defendant, Lemieux was not prima facie established and the evidence did not justify a judgment in their favor either on legal or equitable grounds in each case." From this judgment, the third party plaintiffs have appealed.

The third party plaintiffs claim error in the trial referee's dismissal of their complaint because they allege that there was sufficient evidence presented at the hearing to establish that the third party defendant, Lemieux, owned and operated Armor and that when they guaranteed payment of the plaintiffs' accounts, they were actually acting as mere agents of their principal, Lemieux. The third party plaintiffs claim that the court should have disregarded the corporate entity and imposed liability on Lemieux to the extent of the third party plaintiffs' liability to the plaintiffs on the guarantee.

"A motion for judgment of dismissal has replaced the former motion for nonsuit for failure to make out a prima facie case. Compare Practice Book § 302 with Practice Book, 1963, § 278; see *Lukas* v. *New Haven,* 184 Conn. 205, 210 n.3, 439 A.2d 949 (1981). When such a motion has been granted, the question is whether sufficient facts were proved

to make out a prima facie case. *Pignatario* v. *Meyers,* 100 Conn. 234, 239–40, 123 A. 263 (1924). To state it another way, a judgment of dismissal is proper 'when the evidence produced by the plaintiff, if fully believed, would not permit the trier in reason to find the essential issues on the complaint in favor of the plaintiff.' *Minicozzi* v. *Atlantic Refining Co.,* 143 Conn. 226, 230, 120 A.2d 924 (1956). The evidence offered by the plaintiff is to be taken as true and interpreted in the light most favorable to him, and every reasonable inference is to be drawn in his favor. *Ace-High Dresses, Inc.* v. *J. C. Trucking Co.,* 122 Conn. 578, 579, 191 A. 536 (1937). A party has the same right to submit a weak case as he has to submit a strong one. *Fritz* v. *Gaudet,* 101 Conn. 52, 53, 124 A. 841 (1924). See *Lukas* v. *New Haven,* supra, 210–11; *Crowell* v. *Palmer,* 134 Conn. 502, 505, 58 A.2d 729 (1948); Maltbie, Conn. App. Proc. §§ 215 and 217; Stephenson, Conn. Civ. Proc. (2d Ed.) § 192f." *Hinchliffe* v. *American Motors Corporation,* 184 Conn. 607, 609–10, 440 A.2d 810 (1981).

Viewed in the light most favorable to their case, the third party plaintiffs could be found to have established the following facts at the hearing: Prior to April, 1974, one Rick Soucy and the third party plaintiffs, Mario Leo and John Wentworth, were employed by Gem Paving Company.[1] Lemieux was the president and owner of Gem Paving Company, a union contracting company, and controlled or was the principal of CFL, Inc., a construction equipment leasing company. In September, 1973, Lemieux told Leo, Wentworth and

---

[1] Leo was employed as an estimator and Wentworth was employed as an office manager. Both earned approximately $300 per week. Soucy was a superintendent or a foreman.

Soucy that he wanted to form another paving company (Armor) which would be non-union. Lemieux explained what the structure of the new company would be, who the officers, directors and stockholders would be and how Leo and Wentworth would be officers (president and secretary-treasurer, respectively) in name only because they would still be working for him. Apparently, Leo and Wentworth agreed to this arrangement because they feared losing their jobs if they did not consent.[2] However, Leo and Wentworth indicated to their office secretary that they felt that Lemieux had no right to exercise authority over Armor's affairs in the manner that he did.

In September, 1973, Lemieux contacted his attorney and instructed him to form the new corporation, Armor. About two months later, Lemieux took Leo, Wentworth and Soucy to his attorney's office where only those three signed the necessary corporate documents. The minutes of the organization meeting and first meeting of directors and the by-laws had been fully prepared prior to this meeting. Leo and Wentworth did not consult with and were not represented by legal counsel, nor had they had any prior contact with Lemieux's attorney as to the contents of the corporate documents. No election of directors or officers was ever held. The corporate documents indicated, however, that Leo, Wentworth and Soucy were directors and officers.

No officers' or shareholders' meetings were held subsequent to this initial meeting and the remaining corporate documents were mailed to Lemieux

---

[2] Specifically, they feared that if they did not agree to Lemieux's demands, he would "pull the rug out from under the whole corporation at any time" by recalling his loans, removing his construction equipment and by failing to obtain bonding work for Armor.

at the office of Gem Paving. Lemieux then took these documents to Armor's office to obtain Leo's and Wentworth's signatures.

The corporation started out with initial capital of $15,000. Leo, Wentworth and Soucy were each loaned $5000 by Lemieux which they then used to purchase stock. Leo, Wentworth and Soucy were each issued 500 shares of common stock having a par value of $10 per share. Each was required to execute a personal promissory note in the principal sum of $5000 payable to Lemieux. These notes were never paid, nor did Lemieux ever demand payment until March, 1980, four years after Armor ceased operating.[3] Lemieux did not own any stock in Armor, nor was he listed as an officer or director of the corporation.

On February 1, 1974, Leo, Wentworth, Soucy and Lemieux entered into a written agreement wherein Lemieux was to receive twenty-five percent of Armor's annual net profit before taxes until he should receive $300,000 and thereafter such net profits were to be allocated at the rate of fifty-five percent to Lemieux and fifteen percent to each of the others. Under this agreement Lemieux also had the option to purchase that number of shares necessary to give him fifty-five percent of Armor's stock.[4]

---

[3] Lemieux filed two counterclaims on January 25, 1980 in his answer to the third party action filed by Leo and Wentworth against him; in the counterclaims, he sought to recover the amount of each note together with interest against Leo and Wentworth.

[4] Leo, Wentworth and Soucy had no control over the amount of their own salaries. In fact, when they attempted to raise their salaries in June, 1974 by $50 per week, Lemieux reduced them back to their initial level upon learning of the raises from an audit performed on Armor's books by the same accountant who worked for Lemieux.

Lemieux helped to arrange for the necessary bonding through the same bonding agent employed by Gem Paving. It does not appear that Armor could have bid on bonded jobs without the financial backing of Lemieux and all bids had to be approved by him. Armor was not in a financial position either to buy or rent the equipment necessary for the type of construction work contemplated without the assistance of Lemieux acting through CFL, Inc., his equipment leasing company. Lemieux insisted that all of the construction equipment used by Armor be leased from CFL, Inc. and he personally scheduled such equipment.

Between April, 1974 and October, 1975, Lemieux, who was no longer receiving a salary from Gem Paving Company, or a corporation in which he was a principal, began receiving $700 per week from Armor. In October, 1975, when Armor experienced financial difficulties, these payments were reduced to $350 per week. Some of the payments were made by check payable to Lemieux and were labelled "consultant's fees" while other checks were made payable to CFL, Inc. and were labelled "equipment rental." Lemieux visited Armor's office at least once or twice a week. He had access to Armor's checkbook and all of its financial records and required its officers to report to him periodically. Leo, as president, however, signed all the corporate checks, contracts with customers and bid estimates on jobs.[5]

In October, 1975, when Armor started to experience financial difficulties, Lemieux went to the

[5] Leo had been in the construction business for about twenty-five years. He testified that, based on his experience as an estimator, he had a "pretty good handle" on equipment costs and that the prices charged by CFL, Inc. to Armor were "reasonable."

company's office and took possession of the checkbook. Thereafter, all checks issued by Armor had to be approved by him. In some instances, Armor's checks would be made up by Lemieux's bookkeeper, while in other cases, Lemieux would indicate his approval by making a mark in the corner of such checks. Lemieux never disapproved any check, however.

Armor ceased operating in February, 1976, at the order of Lemieux. Lemieux then took possession of all of the company's equipment and records. The corporate records were thereafter inaccessible to Armor's officers and directors. When Armor ceased operating, it had outstanding debts totalling approximately $200,000, the largest creditors being CFL, Inc. for equipment rentals and the federal government for payroll taxes. Leo and Wentworth received no dividends or other payments from Armor except for their weekly salaries and when the company ceased doing business, they acquired none of its assets. Throughout the time he was president of Armor, however, Leo was never told by Lemieux that there were certain decisions he could or could not make.[6]

"Courts will . . . disregard the fiction of a separate legal entity to pierce the shield of immunity afforded by the corporate structure in a situation in which the corporate entity has been so controlled and dominated that justice requires liability to be imposed on the real actor. 1 Fletcher, Corporations (Perm. Ed. 1963 Rev.) § 43; Ballantine, Corporations (Rev. Ed.) § 136; 18 Am. Jur. 2d, Corporations § 14; see *Vogel* v. *New Milford,* 161 Conn.

---

[6] Wentworth testified that he was responsible for going out and obtaining credit for Armor.

490, 494, 290 A.2d 231 (1971); *Tishman Equipment Leasing, Inc.* v. *Levin,* 152 Conn. 23, 28, 202 A.2d 504 (1964); *Humphrey* v. *Argraves,* 145 Conn. 350, 354, 143 A.2d 432 (1958); *Hoffman Wallpaper Co.* v. *Hartford,* 114 Conn. 531, 535, 159 A. 346 (1932). We have affirmed judgments disregarding the corporate entity and imposing individual stockholder liability when a corporation is a mere instrumentality or agent of another corporation or individual owning all or most of its stock. See *Zaist* v. *Olson,* 154 Conn. 563, 573, 227 A.2d 552 (1967).

"In *Zaist,* we found the controlling stockholder and a related corporation liable under an 'alter ego' theory, concluding that the corporate structure of the defendant in that case could properly have been disregarded under *either* the 'instrumentality' rule or the 'identity' rule. *Zaist* v. *Olson,* supra, 578." (Emphasis in original.) *Saphir* v. *Neustadt,* 177 Conn. 191, 209–10, 413 A.2d 843 (1979).

"The instrumentality rule requires, in any case but an express agency, proof of three elements: (1) Control, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice *in respect to the transaction attacked* so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; (2) that such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of plaintiff's legal rights; *and* (3) that the aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of. *Lowendahl* v. *Baltimore & O.R. Co.,* 247 App. Div. 144,

157, 287 N.Y.S. 62 [1936]; *Fisser* v. *International Bank,* 282 F.2d 231, 238 (2d Cir. [1960]); Powell, [Parent and Subsidiary Corporations] §§ 2, 3; see *Steven* v. *Roscoe Turner Aeronautical Corporation,* 324 F.2d 157, 160 (7th Cir. [1963])." (Emphasis added.) *Zaist* v. *Olson,* 154 Conn. 563, 575, 227 A.2d 552 (1967); see also *Omaha Pollution Control Corporation* v. *Carver-Greenfield Corporation,* 413 F. Sup. 1069, 1091 (D. Neb. 1976).

The identity rule has been stated as follows: " 'If plaintiff can show that there was such a unity of interest and ownership that the independence of the corporations had in effect ceased or had never begun, an adherence to the fiction of separate identity would serve only to defeat justice and equity by permitting the economic entity to escape liability arising out of an operation conducted by one corporation for the benefit of the whole enterprise.' *Mull* v. *Colt Co.,* 31 F.R.D. 154, 163 (S.D. N.Y. [1962]); *Walkovsky* v. *Carlton,* 24 App. Div. 2d 582, 583, 262 N.Y.S.2d 334 [1965]." *Zaist* v. *Olson,* supra, 576.

The third party plaintiffs claim, relying on such cases as *Zaist* and *Saphir,* that the circumstances outlined above demonstrate sufficient manipulation and control over the affairs of Armor by Lemieux so as to justify piercing the corporate veil and treating Armor as a sole proprietorship, holding Lemieux personally liable for the accounts which the third party plaintiffs guaranteed. We do not agree.

We must first determine whether the fact that Lemieux was neither a director, officer or shareholder of Armor effectively insulates him from liability under the instrumentality or identity rules

or other theory designed to disregard the legal fiction of the separate corporate entity. The present case is not the ordinary situation in which a corporate veil is pierced by a creditor suing an individual who has used a corporation as an instrument of fraud. See *Saphir v. Neustadt,* supra; *Zaist v. Olson,* supra. Nor is this a "reverse pierce" situation where an "insider" is attempting to pierce the corporate veil from within the corporation. See, e.g., *Crum v. Krol,* 99 Ill. App. 3d 651, 425 N.E.2d 1081 (1981); *Roepke v. Western National Mutual Ins. Co.,* 302 N.W.2d 350 (Minn. 1981) (piercing corporate veil of one man company to allow stacking of survivor's benefits under no-fault insurance coverage). Instead, this unique situation presents us with an attempt by an insider to pierce the corporate veil to reach an "outsider" who, personally and not through another corporate entity, exercises a great deal of control over corporate affairs.

The concept of piercing the corporate veil is equitable in nature. See *Aetna Casualty & Surety Co. v. Stover,* 327 F.2d 288, 291 (8th Cir. 1964); *Shearson Hayden Stone, Inc. v. Lumber Merchants, Inc.,* 500 F. Sup. 491, 501 (S.D. Fla. 1980); *Roepke v. Western National Mutual Ins. Co.,* supra; *Southern Union Exploration Co. v. Wynn Exploration Co.,* 95 N.M. 594, 600, 624 P.2d 536 (1981); 1 Fletcher, Cyc. Corp. (Perm. Ed. 1974 Rev.) § 41.2, p. 179; see also comment, "Alternative Methods of Piercing the Corporate Veil in Contract and Tort Cases," 48 B.U.L. Rev. 123 (1968). "No hard and fast rule, however, as to the conditions under which the entity may be disregarded can be stated as they

vary according to the circumstances of each case." (Footnote omitted.) 1 Fletcher, op. cit., § 41.3, p. 191.[7]

In *Zaist* v. *Olson,* supra, 574, we stated: "The circumstance that control is exercised merely through dominating stock ownership, of course, is not enough. *Hoffman Wall Paper Co.* v. *Hartford,* [114 Conn. 531, 535, 159 A. 346 (1932)]; see *Kulukundis* v. *Dean Stores Holding Co.,* 132 Conn. 685, 689, 47 A.2d 183 [1946]. There must be 'such domination of finances, policies and practices that the controlled corporation has, so to speak, no separate mind, will or existence of its own and is but a business conduit for its principal.' 1 Fletcher, op. cit., p. 205."

This is a clear indication that stock ownership, while important, is not a prerequisite to piercing the corporate veil but is merely one factor to be considered in evaluating the entire situation. Similarly, we have never required that an individual be an officer or director of the pierced corporation in order to hold him liable for the debts of the corporation. It is clear that the key factor in any decision to disregard the separate corporate entity is the element of control or influence exercised by the individual sought to be held liable over cor-

---

[7] "The circumstances which have been considered significant in an action to disregard the corporate entity have rarely been articulated with any clarity. Perhaps this is true because the circumstances necessarily vary according to the facts of the particular case. Therefore, each case in which the issue is raised should be regarded as sui generis, to be decided in accordance with its own underlying facts. Since the issue is thus one of fact, its resolution is particularly within the province of the trial court and such resolution will be regarded as presumptively correct and will be left undisturbed on appeal unless it is clearly erroneous." (Footnotes omitted.) 1 Fletcher, Cyc. Corp. (Perm. Ed. 1981 Sup.) § 41.3, p. 38.

porate affairs. See *Saphir* v. *Neustadt*, supra, 210; *Zaist* v. *Olson*, supra, 574–75; *Hoffman Wall Paper Co.* v. *Hartford*, 114 Conn. 531, 534–35, 159 A. 346 (1932). Thus, while the usual case does involve a director, officer or shareholder of a corporation, the lack thereof, in an unusual case such as this, would not prevent us from imposing liability upon an individual by piercing the corporate veil if the evidence demonstrated the requisite level of control and otherwise satisfied the instrumentality or other applicable test. See *In re Flanzbaum*, 10 B.R. 420 (S.D. Fla. 1981) (finding that corporation was alter ego of debtor even after debtor resigned as an officer and sold all his stock to another person); see also *Krivo Industrial Supply Co.* v. *National Distillers & Chemical Corporation*, 483 F.2d 1098, 1105 (5th Cir. 1973) ("If a lender becomes so involved with its debtor that it is in fact actively managing the debtor's affairs, then the quantum of control necessary to support liability under the 'instrumentality' theory may be achieved."); *Werner* v. *United States*, 374 F. Sup. 558 (D. Conn. 1974), aff'd, 512 F.2d 1381 (1975) (holding defendant liable for withholding taxes even though defendant was not an officer, shareholder or director).

"Ordinarily the corporate veil is pierced only under exceptional circumstances, for example, where the corporation is a mere shell, serving no legitimate purpose, and used primarily as an intermediary to perpetuate fraud or promote injustice." *Newberry* v. *Barth, Inc.*, 252 N.W.2d 711, 714 (Iowa 1977); see *Saphir* v. *Neustadt*, supra, 209; *Hoffman Wall Paper Co.* v. *Hartford*, supra, 535. Even though the evidence, when viewed in the light most favorable to the third party plaintiffs, demonstrates that Lemieux did indeed exercise a considerable

amount of control (although he was not a director, officer or shareholder) over the business affairs of Armor, with respect to the specific transaction attacked; see *Saphir* v. *Neustadt,* supra, 210; there is insufficient evidence of Lemieux's dominance or influence such as is required to disregard the separate legal entity of the corporation.

The specific transaction out of which the third party plaintiffs' liability arises is the signing of the plaintiffs' guarantee. There was simply no evidence presented[8] which could show that, with respect to the signing of the guarantee, Lemieux's control was "used . . . to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of [the third party plaintiffs'] legal rights; and . . . that the aforesaid control and breach of duty . . . proximately cause[d] the injury or unjust loss complained of." *Zaist* v. *Olson,* supra, 575. The third party plaintiffs were aware of the guarantee and the evidence reveals that they procured it on their own and signed it voluntarily.[9] There has been no showing that Lemieux, through Armor or individually, coerced or even requested the third party plaintiffs to sign the guarantee. In

---

[8] The dissent attempts by way of "permissible inference" to demonstrate that Lemieux used his control of Armor to avoid his liability. We do not agree that any such inference would be permissible under the evidence offered in this case. It is within the province of the trier of fact, in civil as well as criminal cases, to draw reasonable and logical inferences from the facts proven. See *State* v. *Gonski,* 155 Conn. 463, 467, 232 A.2d 483 (1967), and cases cited therein. Moreover, "[m]ere possibilities or suppositions will not sustain a legitimate inference of the existence of a fact nor can it be drawn by conjecture only." *General Petroleum Products, Inc.* v. *Merchants Trust Co.,* 115 Conn. 50, 58, 160 A. 296 (1932).

[9] Wentworth testified that, to his knowledge, the materials purchased from Ashland and Tomasso were actually used for the benefit of Armor.

fact, it does not even appear that Lemieux was involved in or had knowledge of this transaction. Whatever Lemieux's role might otherwise have been with regard to other corporate actions, it cannot be said that Armor was a mere instrumentality or agent of Lemieux in connection with the signing of the guarantee. The fact that the corporate veil could be disregarded for some purposes does not mean that it must be disregarded for all purposes. *Cooperman* v. *Unemployment Ins. Appeals Board,* 49 Cal. App. 3d 1, 8, 122 Cal. Rptr. 127 (1975); see *United States* v. *Goldberg,* 206 F. Sup. 394, 405 (E.D. Pa. 1962), aff'd, 330 F.2d 30, cert. denied, 377 U.S. 953, 84 S. Ct. 1630, 12 L. Ed. 2d 497 (1964); *Norman* v. *Murray First Thrift & Loan Co.,* 596 P.2d 1028, 1032 (Utah 1979). "It is true that courts will disregard legal fictions, including that of a separate corporate entity, when they are used for fraudulent or illegal purposes. Unless something of the kind is proven, however, to do so is to act in opposition to the public policy of the state as expressed in legislation concerning the formation and regulation of corporations." *Humphrey* v. *Argraves,* 145 Conn. 350, 354, 143 A.2d 432 (1958), quoting *Kulukundis* v. *Dean Stores Holding Co.,* 132 Conn. 685, 689, 47 A.2d 183 (1946). The third party plaintiffs cannot successfully hold Lemieux liable under the instrumentality rule.

The identity rule similarly offers the third party plaintiffs no relief. The evidence presented does not "'show that there was such a unity of interest and ownership that the independence of the corporation had in effect ceased or had never begun, [such that] an adherence to the fiction of separate identity would serve only to defeat justice and equity by permitting the economic entity to escape

liability arising out of an operation conducted by one corporation for the benefit of the whole enterprise.'" *Saphir* v. *Neustadt,* supra, 210. The identity rule primarily applies to prevent injustice in the situation where two corporate entities are, in reality, controlled as one enterprise because of the existence of common owners, officers, directors or shareholders and because of the lack of observance of corporate formalities between the two entities.[10] See *Zaist* v. *Olson,* supra, 575–76, 578 (and cases cited therein). The third party plaintiffs have neither claimed nor presented evidence that Armor and Gem, the company of which Lemieux was president, were actually one enterprise. Therefore, the identity rule cannot avail the third party plaintiffs of the relief they seek.[11]

While the result we reach in this case may seem harsh, this court does not and cannot rescue a party from its own unfavorable or unwise business deal-

[10] Other cases illustrate the application of our "identity rule," as we have described it, though under the heading of the "instrumentality" or "alter ego" rule. See *Houston Oil Field Material Co.* v. *Stuard,* 406 F.2d 1052 (5th Cir. 1969); *Northern Illinois Gas Co.* v. *Total Energy Leasing Corporation,* 502 F. Sup. 412 (N.D. Ill. 1980); *Brown* v. *Margrande Compania Naviera, S.A.,* 281 F. Sup. 1004 (E.D. Va. 1968); *Elliott* v. *Occidental Life Ins. Co. of California,* 272 Cal. App. 2d 373, 77 Cal. Rptr. 453 (1969); *My Bread Baking Co.* v. *Cumberland Farms, Inc.,* 353 Mass. 614, 233 N.E.2d 748 (1968); *Westcott Construction Corporation* v. *Cumberland Construction Co.,* 3 Mass. App. 294, 328 N.E.2d 522 (1975).

[11] We note that the dissent attempts to apply the "identity rule" to this fact situation. However, this would ignore the plain language of that rule which operates to pierce the corporate veil where "'adherence to the fiction of separate identity would serve only to defeat justice and equity by permitting *the economic entity* to escape liability arising out of an operation conducted by *one corporation* for the benefit of the *whole enterprise.'*" (Emphasis added.) *Zaist* v. *Olson,* 154 Conn. 563, 576, 227 A.2d 552 (1967). In this case, there is no "economic entity" which would "escape liability" as set out in the rule. The dissent's characterization of Lemieux and

ings. " 'A hard bargain is not enough to energize the equitable power to disregard the corporate form.' " *Chengelis* v. *Cenco Instruments Corporation,* 386 F. Sup. 862, 865 (W.D. Pa.), aff'd, 523 F.2d 1050 (1975). The evidence, viewed in the light most favorable to the third party plaintiffs; see *Hinchliffe* v. *American Motors Corporation,* supra, 610; simply does not establish a prima facie case for piercing the corporate veil in the fashion pressed as to the specific transaction complained of. The issue of whether the corporate veil is pierced presents a question of fact. *Stark* v. *Coker,* 20 Cal. 2d 839, 129 P.2d 390 (1942); see 1 Fletcher, op. cit., § 41.3, p. 191. Whether the third party plaintiffs made out a prima facie case presented a question of law. "On appeal, it is the function of this court to determine whether the decision of the trial court is clearly erroneous. See Practice Book, 1978, § 3060D." *Pandolphe's Auto Parts, Inc.* v. *Manchester,* 181 Conn. 217, 221, 435 A.2d 24 (1980). We

---

Armor as the "economic entity" and Armor as the "one corporation" which conducted the operation for the benefit of the "whole enterprise" is quite unique. Not only was there no trace of evidence whatsoever, and therefore no basis for any inference, that Armor "conducted" any "operation" for the benefit of the "whole enterprise," but, in fact, this claim was not even alleged by the third party plaintiffs.

In *Saphir* v. *Neustadt,* 177 Conn. 191, 413 A.2d 843 (1979), as the dissent points out, there were but two defendants, the corporation, CLESCO, and the individual. It was proper, in that case, to prevent the "economic entity," i.e., the defendant CLESCO, from escaping liability. In the present matter, however, as the dissent fails to realize, Armor was never joined as a third party defendant, nor did the third party plaintiffs ever allege that Armor was "escaping liability." It is for such reasons that the identity theory, as it is defined in our cases, cannot apply to this case to make Lemieux liable in this guaranty transaction.

cannot say that the referee's decision was clearly erroneous based on the evidence before him.

There is no error.

In this opinion PARSKEY, ARMENTANO and SHEA, Js., concurred.

BORDEN, J. (dissenting). Had the state referee denied the motion to dismiss and then, after hearing all the evidence, decided in favor of Lemieux on the basis that factually neither the instrumentality nor the identity theory was proven by a preponderance of the evidence such a decision would undoubtedly have to be sustained as not clearly erroneous. Practice Book § 3060D. "The circumstances which have been considered significant in an action to disregard the corporate entity have rarely been articulated with any clarity. Perhaps this is true because the circumstances necessarily vary according to the facts of the particular case. Therefore, each case in which the issue is raised should be regarded as sui generis, to be decided in accordance with its own underlying facts. Since the issue is thus one of fact, its resolution is particularly within the province of the trial court and such resolution will be regarded as presumptively correct and will be left undisturbed on appeal unless it is clearly erroneous." (Footnotes omitted.) 1 Fletcher, Cyc. Corp. (Perm. Ed. 1981 Sup.) § 41.3, p. 38, also quoted at footnote 7 of the majority opinion. Because, however, the standard on a motion to dismiss is as the majority states it; see *Hinchliffe* v. *American Motors Corporation,* 184 Conn. 607, 609–10, 440 A.2d 810 (1981); and because the majority has unduly restricted the applicability of the instrumentality theory and the scope of the identity theory, I dissent.

## I

As the majority opinion recognizes, this court made clear in *Saphir* v. *Neustadt,* 177 Conn. 191, 209–10, 413 A.2d 843 (1979), and in *Zaist* v. *Olson,* 154 Conn. 563, 575, 227 A.2d 552 (1967), that the instrumentality and identity theories are separate but equally viable theories under which a court may, where equity demands; see *Aetna Casualty & Surety Co.* v. *Stover,* 327 F.2d 288, 291 (8th Cir. 1964); pierce the corporate veil.

The instrumentality theory requires, except in cases of express agency, proof of three elements: (1) complete control "in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own"; (2) the control was used by the defendant for an improper purpose, i.e. "to perpetrate the violation of a . . . positive legal duty, or a dishonest or unjust act in contravention of plaintiff's legal rights"; and (3) the control and breach of the duty caused the plaintiff's loss. *Zaist* v. *Olson,* supra. I read the majority opinion as finding the plaintiffs' evidence insufficient on the first two requirements of the instrumentality theory. A "judgment of dismissal is proper 'when the evidence produced by the plaintiff, if fully believed, would not permit the trier in reason to find the essential issues on the complaint in favor of the plaintiff.' *Minicozzi* v. *Atlantic Refining Co.,* 143 Conn. 226, 230, 120 A.2d 924 (1956). The evidence offered by the plaintiff is to be taken as true and interpreted in the light most favorable to him, and every reasonable inference is to be drawn in his favor. *Ace-High Dresses, Inc.* v. *J.C. Trucking Co.,* 122

Conn. 578, 579, 191 A. 536 (1937). A party has the same right to submit a weak case as he has to submit a strong one." *Hinchliffe* v. *American Motors Corporation,* supra. Under this standard there was enough evidence introduced which, if believed, if interpreted most favorably to the plaintiffs and if every reasonable inference were drawn in their favor, would permit a rational fact finder to find both of these essential issues in the plaintiffs' favor.

The majority opinion omits certain evidence, and glosses over other evidence, which adds to the basis from which a fact finder could draw an inference of total control of Armor by Lemieux. The attorney selected by Lemieux to form Armor, who had previously represented Lemieux but had never represented Leo or Wentworth, stated at the incorporation meeting that he represented Lemieux's interests only.[1] Although Lemieux owned no stock in the company, and was not listed as an officer or director, he nevertheless determined how the corporation was to be operated. The corporate minute book and stock transfer book remained continuously in the same attorney's possession from their preparation until after Armor ceased operating. Armor did not start operating until April, 1974. Between the date of incorporation and April, 1974 Leo and Wentworth continued as salaried employees of Gem. Thereafter Armor paid them salaries which had been previously established by Lemieux and which

---

[1] I find it passing strange that the attorney forming the corporation found it necessary to inform its only incorporators, shareholders, officers and directors that he was representing only an outsider. The inference is permissible, at least, that at its legal birth it was under the total control of Lemieux. Indeed, as the majority notes, before the company was formed Lemieux told Leo and Wentworth that they would be "officers in name only because they would still be working for him."

were based on what had been previously paid them by Gem. Neither Leo nor Wentworth had any voice in determining the amount of their salaries, and they performed generally the same functions with Armor as they had performed as employees of Gem. On March 1, 1974, with Lemieux's consent, Armor established its office in Newington. Lemieux arranged for Armor to obtain a bank loan the proceeds of which were used to purchase office equipment and a truck from Gem. The price of the equipment was established by Lemieux, who personally guaranteed payment of the note. On several occasions Wentworth complained to Lemieux without success about rental charges for equipment leased to Armor by Lemieux's leasing company, which equipment was not being used by Armor. Equipment rental charges claimed by Lemieux's leasing company amounted to approximately $20,000 per month. When Soucy left Armor he notified Lemieux who replaced him with Lemieux's brother. Lemieux then instructed the corporate attorney to prepare the documents evidencing this substitution. Between April, 1974 and October, 1975, because he was no longer receiving a salary from Gem, Lemieux demanded and received from Armor payment of $700 per week. In October, 1975, when Armor was in financial trouble, these payments were reduced to $350 per week. Some of these weekly payments were in the form of checks made payable to Lemieux personally and labeled "consultant's fees," others were in the form of checks payable to Lemieux's leasing company labeled "equipment rental." In January, 1975 Lemieux directed that the salaries of Leo and Wentworth be increased by $200 per week each, and the salary of the office secretary by $300 per week. These salary

checks were then cashed and, at Lemieux's direction, the cash differential amounting to $700 per week was paid over to him. This arrangement terminated after a couple of weeks at the insistence of the office secretary's husband. The total of these payments for "consultant's fees," "equipment rental" and cash kickbacks amounted to $53,000. These payments were not related to actual services rendered to Armor, but were made to Lemieux because Leo and Wentworth considered him to be the owner of the company. Lemieux selected the accountant to audit Armor's books. This was the same accountant employed by Gem and Lemieux's leasing company. Bills for his services were sent to Lemieux's office, not to Armor's. Lemieux referred business to Armor and on occasion would personally telephone customers of Armor to obtain payment for work that had been completed, or would personally go to them and pick up checks. Lemieux engaged an attorney to represent Armor in the collection of its delinquent accounts. Although not the same attorney who formed Armor, it was the same attorney who represented Lemieux's other corporations and who represented him personally, including representing him in the trial of this action. The same attorney represented Armor in obtaining an arbitration award of $106,000. Armor's officers learned of this award through the newspaper. The entire award was appropriated by the bonding company to cover claims relating to bonded jobs.

I believe that this evidence, together with the evidence recited in the majority opinion, would have permitted a finding that from its cradle to its grave Armor was under the total control of Lemieux. I emphasize here that the question before the trial court on the motion to dismiss was not

whether the plaintiffs had proven this control by a preponderance of the evidence; the issue was whether all the evidence, taken as true, interpreted in the light most favorable to the plaintiffs and with the benefit of every reasonable inference drawn in their favor, would have permitted a rational fact finder to find that control. Without belaboring the point, in addition to the evidence indicated by the majority, I note the evidence indicating the following, in general terms. Lemieux created Armor through his attorney, who did not represent its incorporators, officers or directors. Lemieux supplied the initial capital. Lemieux installed Leo, Wentworth and Soucy as officers in name only, who were to continue to work for him. Lemieux and his attorney controlled all official corporate books and records; and he retained the right to, and at times exercised, control of all financial records of the corporation. Lemieux determined how the corporation was to be operated. Lemieux controlled the profits[2] of and salaries paid by the corporation, including $700 per week paid to him as consultant fees or to his leasing company, a sum which equaled the combined salaries of Leo and Wentworth. This financial control extended to the point of requiring additional cash kickbacks from salaries paid to corporate employees. The total of these payments to Lemieux or for his benefit was $53,000. These payments were unrelated to his actual services to Armor, but were made because Leo and Wentworth considered him to be Armor's owner. Lemieux controlled the collection of all accounts due the corporation, to the point of engaging his own attorney to obtain a sub-

---

[2] By controlling the amount of salaries, cash kickbacks, and equipment rental and consultant payments unrelated to his services to Armor, Lemieux could control whether there were any corporate profits. There apparently were none.

stantial arbitration award for the corporation whose officers learned of it from the newspaper. Lemieux required that all equipment be leased from his leasing company at prices set by him. When Armor ceased operating Lemieux took possession of all its assets and records, and made them inaccessible to Armor's officers and directors.

I take issue with the majority's characterization of Lemieux's role as no more than "a considerable amount of control (although he was not a director, officer or shareholder) over the business affairs of Armor . . . ." First, I think that the evidence would permit an inference of "complete domination, not only of finances but of policy and business practice"; *Zaist* v. *Olson,* supra; although it would also permit an inference of a "considerable amount of control." In such a case on a motion to dismiss the inference favorable to the plaintiffs must be drawn. Second, the very fact that Lemieux was *not* a majority or sole shareholder of this closely held corporation could, in the context of the evidence of his dominance over its birth, life and death generally, form part of the factual basis for an inference of the kind of control required to pierce the corporate veil. One would expect a majority or sole shareholder of a closely held corporation to be its dominating influence. A trier could, however, reasonably infer that where control is exercised instead by one who is, on paper, unconnected to the corporation's official life that control must, by virtue of some undisclosed reasons, be more than "considerable"; otherwise, how would one explain the stranger's control at all? Finally, a trial court asked to draw such an inference could reasonably do so with less reluctance in the case of a nonshareholder controlling person than a shareholder

controlling person. Where the individual behind the veil is the majority or sole shareholder the court must always be on guard against "countenanc[ing] . . . the imposition of the legitimate indebtedness of a corporation upon a majority [or sole] stockholder in derogation of his legal immunity merely because of the corporate control inherent in his stock ownership. To do so would be to act in opposition to the public policy of this state as expressed in legislation concerning the formulation and regulation of corporations." *Saphir* v. *Neustadt,* supra, 212. Where however, as here, there is evidence to permit the inference that the individual behind the veil chooses to exercise his corporate control through nominees and thus to shield his identity and control, for whatever purposes, from those doing business with the corporation, and where the trier draws that inference, that legitimate public policy fades somewhat in importance.[3] General Statutes § 33-298 (c) (3) requires each corporation to file an annual report setting forth, inter alia, "the names and respective business and residence addresses of the directors and officers of the corporation"; and § 33-298 (e) requires the report to "contain a statement under the [criminal] penalties of false statement"; see General Statutes § 53a-157; "that the statements contained in the report are true." See also General Statutes § 33-302, which provides a mechanism for the secretary of the state to propound interroga-

---

[3] Using a nominee to perform the duties of officer and director is quite unlike using a nominee to hold title to shares equitably owned by the nominor, a practice which, if not common is not uncommon in business practice and may be dictated by legitimate business or personal needs. Unlike shareholders, officers and directors even of a closely held corporation have statutory and fiduciary duties incident to their offices which cannot be delegated. See generally 3 Fletcher, Cyc. Corp. (Perm. Ed. 1975 Rev.) § 990.

tories to every corporation and its officers and directors to "enable him to ascertain whether such corporation has complied with the provisions of this chapter applicable to such corporation," and which requires those interrogatories to be answered "truthfully" under penalty of a $500 fine. General Statutes § 33-302 (b). Surely these simple requirements of truthfulness do not contemplate the naming of persons as officers and directors who are such in name only because they are still working for someone else. At the least, this could rationally be a factor to be considered by a trial court, faced with the issue "sui generis, to be decided in accordance with its own underlying facts"; 1 Fletcher, op. cit., § 41.3, p. 38; of whether, on one hand, to draw the inference of the requisite control or, on the other hand, whether "[t]o do so would be to act in opposition to the public policy of this state as expressed in legislation concerning the formulation and regulation of corporations." *Saphir* v. *Neustadt,* supra.

To be sure, there must not only be complete control of a corporation generally; that control must extend to "policy and business practice in respect to the transaction attacked . . . ." *Zaist* v. *Olson,* supra. The transaction here was the personal guarantee, in early April, 1974 at the inception of Armor's corporate life, by Leo and Wentworth of a line of credit extended by Tomasso and Ashland to Armor pursuant to which Armor, in September, 1975, ordered and received, but never paid for, concrete and stone totaling about $12,500. By the plaintiffs' evidence, taken at its best, it is a permissible inference that from beginning to end Lemieux controlled the amount of capitalization of Armor. Wentworth, who was its secretary-treasurer, was responsible for obtaining credit for

Armor. One can infer that he had actual authority to perform that part of his responsibility. Armor began doing business in April, 1974, capitalized at $15,000 supplied in effect by Lemieux through loans to Leo, Wentworth and Soucy. During that same first month of its life Leo and Wentworth signed the personal guarantees of the lines of credit. Certainly the realities of the business world would permit the inference that material suppliers would, before extending credit to a newly formed corporation with no substantial visible assets and no business history, require personal guarantees of those who appear to be in control; and it is an equally permissible inference that Lemieux, as an experienced businessman, with full access to and control of Armor's books and records, knew or should have known, even without being specifically told, that such guarantees were likely. Did he think that credit was being extended to Armor on the strength of its assets and history? This is the same corporation that was not even strong enough financially to buy or rent the equipment necessary for its contemplated work without Lemieux's assistance acting through his leasing company; and it is the same corporation for which he had to guarantee personally a bank loan in order for it to buy office equipment and a truck from Gem. To preclude such inferences as a matter of law in light of all the evidence produced here is to blink at reality. What Justice Cotter said of one person corporations is equally true of this three person (on its face) corporation: "Persons dealing with such corporations may refuse to contract without a personal guarantee of payment from the principal[s]." *Zaist* v. *Olson,* supra, 582 (*Cotter, J.,* dissenting). Pursuant to this personal guarantee of a line of credit the materials were delivered to

Armor and thus, inferentially, inured to no one's benefit but Lemieux's since Leo and Wentworth never received any dividends or other payments from Armor except for their weekly salaries. In sum, the evidence would permit findings that Lemieux's control amounted to complete domination; that the control extended to the policy and business practice of obtaining materials for the corporation to use in its paving business, including arranging for credit to do so; that the financial circumstances which made the personal guarantees necessary were under Lemieux's control, that he was or should have been aware of them; and "that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own . . . ." *Zaist* v. *Olson,* supra, 575.

The final element of the instrumentality rule which the majority finds wanting is that the control was used for some improper purpose. The majority argues that because Lemieux did not coerce[4] or request Leo and Wentworth to sign the guarantee, because there is no direct evidence of Lemieux's knowledge of it, and because the signing was not motivated by some fraud or otherwise illegal purpose, the plaintiffs' evidence is insufficient. I disagree. The lack of fraud or illegality is not dispositive. The requirement is "that such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory *or other positive legal duty, or a dishonest or unjust act in contravention of plaintiff's legal rights . . . ."* (Emphasis added). *Zaist* v. *Olson,* supra.

---

[4] The fact of coercion *vel non* is beside the point. I would assume that in most if not all of the garden variety veil-piercing cases the claimant was not coerced into performing his part of the bargain with the corporation. See, e.g., *Zaist* v. *Olson,* 154 Conn. 563, 227 A.2d 552 (1967).

Leo and Wentworth were told that they were officers in name only and were working for Lemieux. It was Wentworth's responsibility to secure credit for Armor. If an agent on his principal's business is required to pledge his own credit to buy goods the principal has a duty to indemnify him against loss. See Reuschlein & Gregory, Agency and Partnership § 89. Thus it is a permissible inference that Lemieux used his control to avoid his positive legal duty of indemnification. Furthermore, as the facts and reasoning of *Zaist* itself clearly demonstrate the refusal by the veiled individual to pay for goods and services rendered, by one who seeks to pierce that veil, for the ultimate benefit not of the corporation but of the person controlling it is itself sufficient to constitute a dishonest or unjust act in contravention of the plaintiff's legal rights. In *Zaist* the plaintiffs rendered goods and services to a corporation which was controlled by an individual and which was inadequately capitalized to pay them in full, although it did pay them all but $23,000 of $193,000 worth of work and material. The fruit of the plaintiffs' labor ultimately grew on land owned by the individual. The record was bereft of any indication of fraud, illegality or violation of statutory or other legal duty by the individual. The court noted that it was even immaterial that the plaintiffs were unaware of or indifferent to the identity of the owner of the property which would receive the benefit of their work. Id., 572. Based on the facts that the individual controlled the corporation; that the corporation undertook no obligation of its own to the plaintiffs; was financially unable to pay the amount due on the transaction and reaped no benefit from it; and that the individual would be enriched by the amount by which the corporation defaulted; the court con-

cluded "that the control was used to perpetrate an unjust act in contravention of the plaintiffs' rights; and that it caused the unjust loss complained of." *Zaist* v. *Olson,* supra, 578.

Similarly, here there is evidence to permit a finding that the goods supplied to Armor, which generated the claim which the plaintiffs are being required to pay, inured to Lemieux's ultimate benefit. When Armor ceased operating Lemieux took exclusive control of all its assets. To the extent that the material supplied was still on hand he alone could reap its benefits. To the extent that it had been used by Armor in the course of its business any funds generated by that use were divertible at his discretion as part of the weekly payments made to him or his leasing company by Armor, which payments were unrelated to his actual services to Armor but were made to him because Lemieux and Wentworth considered him to be its owner.

In sum, there was evidence here to permit the findings that "[t]he undertaking throughout was [Lemieux's], planned and carried out . . . for his own . . . enrichment, a part of which, if the plaintiffs were to be denied a recovery, would consist of the amount which [Armor], as the plaintiffs' ostensible debtor, is unable to pay because [Lemieux has] not provided the final necessary funds." *Zaist* v. *Olson,* supra, 578.

For these reasons I would hold that sufficient evidence was produced under the instrumentality theory to survive Lemieux's motion to dismiss.

## II

The sufficiency of the evidence to make out a prima facie case under the identity theory is, I believe, even more persuasive, and is simpler to

articulate. Unlike the instrumentality theory, under which there are three specific elements of proof, the identity theory is undifferentiated. "The identity rule . . . has been expressed as follows: 'If plaintiff can show that there was such a unity of interest and ownership that the independence of the corporation had in effect ceased or had never begun, an adherence to the fiction of separate identity would serve only to defeat justice and equity by permitting the economic entity to escape liability arising out of an operation conducted by one corporation for the benefit of the whole enterprise.' " *Saphir* v. *Neustadt,* supra, 210.

The majority argues that the identity theory "primarily" applies to prevent injustice where two corporations are controlled as one enterprise; and that because the plaintiffs presented no evidence linking Armor and Gem, Lemieux's other corporation, in one enterprise that rule does not apply. This argument, by sliding silently from "primarily" to "exclusively," erroneously narrows the scope of the identity rule as applied in this court's two leading cases.

In *Zaist* v. *Olson,* supra, the trial court rendered judgment against both the individual, Olson, who controlled the corporation and against a related corporation, Olson, Inc., also controlled by him. This court sustained the judgment against the individual as well as the related corporation on both the instrumentality and identity theories. In addressing the latter, the court stated: "The court could, with equal propriety, reach the conclusion that the identity of Olson and Olson, Inc., was such that judgment against Olson, Inc., was warranted. The court in fact rendered judgment for the full amount against both Olson and Olson, Inc. This

aspect of the judgment is not in issue since neither of those defendants has claimed that the other is either solely or partially responsible for the amount found due. Indeed, each of those two defendants steadfastly denied that either was liable to the plaintiffs for anything." *Zaist* v. *Olson,* supra, 578. The same could be said here. Neither Lemieux nor Gem claim that the other is either solely or partially responsible for any amount due Leo and Wentworth; each, it can fairly be assumed, denies that either is liable to the plaintiffs for anything. Nonetheless, it could be argued from this language that, despite the affirmance of the judgment against the individual on the identity theory, *Zaist* left open the door to the suggestion that the identity theory requires two corporations in one enterprise, rather than one corporation and a controlling individual.

That door was firmly closed, however, by *Saphir* v. *Neustadt,* supra. In *Saphir,* there were but two defendants: the corporation, CLESCO, and its controlling individual, Neustadt. The court characterized *Zaist* as follows: "In *Zaist,* we found the controlling stockholder and a related corporation liable under an 'alter ego' theory, concluding that the corporate structure of the defendant in that case could properly have been disregarded under *either* the 'instrumentality' rule or the 'identity' rule. *Zaist* v. *Olson,* supra, 578. Similarly, we have concluded that the defendant Neustadt could properly have been held liable, and the corporate structure of CLESCO disregarded, under either theory." (Emphasis in original.) *Saphir* v. *Neustadt,* supra, 209–10. The court restated the identity rule from *Zaist* as follows: " 'If plaintiff can show that there was such a unity of interest and

ownership that the independence of the corporation had in effect ceased or had never begun, an adherence to the fiction of separate identity would serve only to defeat justice and equity by permitting the economic entity to escape liability arising out of an operation conducted by one corporation for the benefit of the whole enterprise.' Id., 576." *Saphir* v. *Neustadt,* supra, 210.[5] In holding that the individual could be held liable under the identity theory the court stated: "Moreover, the court could conclude that there existed a unity of interest and ownership between CLESCO and Neustadt such that the purposes of justice would be served by disregarding the shield of CLESCO's corporate structure. In sum, we find no error in the court's conclusions imposing liability on CLESCO and Neustadt individually. See *House of Koskot Development Corporation* v. *American Line Cosmetics, Inc.,* 468 F.2d 64, 66–67 (5th Cir. 1972) ; *Segan Construction Corporation* v. *Nor-West Builders, Inc.,* 274 F. Sup. 691, 698–99 (D. Conn. 1967) ; *Plank* v. *Arban,* 241 So. 2d 198, 200 (Fla. App. 1970)." Id., 211. Indeed, in each of these three cases cited with approval for application of the identity theory a controlling individual was held liable for a corporate obligation.

As a matter of policy I see no reason to permit recovery against a controlling individual under the instrumentality theory but to deny it under the

---

[5] It is interesting to note that the original quote in *Zaist* referred to " 'such a unity of interest and ownership that the independence of the *corporations* had in effect ceased or had never begun' " (emphasis added) ; *Zaist* v. *Olson,* 154 Conn. 563, 576, 227 A.2d 552 (1967) ; whereas the quote in *Saphir,* in which there is only one corporation, refers to " 'such a unity of interest and ownership that the independence of the *corporation* had in effect ceased or had never begun.' " (Emphasis added.) *Saphir* v. *Neustadt,* 177 Conn. 191, 210, 413 A.2d 843 (1979).

identity theory. They are simply slightly different roads to the same destination.[6] They both derive from the same principle: "Courts will . . . disregard the fiction of a separate legal entity to pierce the shield of immunity afforded by the corporate structure in a situation in which the corporate entity has been so controlled and dominated that justice requires liability to be imposed on the real actor."[7] *Saphir* v. *Neustadt,* supra, 209. And they both require uniquely factual determinations by the trial court, in which "each case in which the issue is raised should be regarded as sui generis, to be decided in accordance with its own underlying facts." 1 Fletcher, op. cit., § 41.3. Lemieux's total control over the enterprise began with Armor's incorporation, at which he installed Leo and Wentworth as officers in name only who would still be working for him. Thus Armor's independence never began. The inference is permissible that Leo and Wentworth had the reasonable expectation, drawn from agency principles, that their principal would indemnify them for any reasonable expenses they incurred in advancing his business. See Reuschlein & Gregory, op. cit., § 89. This dominance continued throughout Armor's course of business. The evidence produced here was sufficient to make out a prima facie case " 'that there

---

[6] Some courts have characterized them as "interchangeable." See *House of Koskot Development Corporation* v. *American Line Cosmetics, Inc.,* 468 F.2d 64, 67 n.2 (5th Cir. 1972); *Weisser* v. *Mursam Shoe Corporation,* 127 F.2d 344, 348 n.11 (2d Cir. 1942).

[7] In *Zaist* this court phrased the same principle as follows: "When, however, the corporation is so manipulated by an individual or another corporate entity as to become a mere puppet or tool for the manipulator, justice may require the courts to disregard the corporate fiction and impose liability on the real actor." *Zaist* v. *Olson,* 154 Conn. 563, 574–75, 227 A.2d 552 (1967). The puppet metaphor is particularly apt here, where Lemieux was the puppeteer, invisible to the audience but manipulating Leo, Wentworth and Armor.

was such a unity of interest and ownership [between Lemieux and Armor] that the independence of the corporation had in effect ceased or had never begun, [so that] an adherence to the fiction of separate identity would serve only to defeat justice and equity by permitting the economic entity [Lemieux and Armor] to escape liability arising out of an operation conducted by one corporation [Armor] for the benefit of the whole enterprise.' " *Saphir* v. *Neustadt*. supra, 210.

### III

The effect of the majority opinion, when viewed through a different procedural prism, illuminates what I believe to be its error. Let us assume that, instead of Leo and Wentworth, the original unpaid suppliers, Tomasso and Ashland, were seeking to pierce the corporate veil and hold Lemieux liable for the underlying corporate obligations. Let us assume also that Tomasso and Ashland produced the same evidence as did Leo and Wentworth, and that the trial court denied the motion to dismiss and rendered judgment for the claimants under the instrumentality or identity theory or both. The necessary import of the majority decision would be to require a reversal on the ground that the trial court could not have rationally drawn the required inferences and could not have rationally reached the required factual conclusions. I cannot square such a result with this court's decisions upholding the trial courts' conclusions on the facts produced in *Saphir* v. *Neustadt,* supra, and *Zaist* v. *Olson,* supra.

In *Saphir,* Neustadt was the sole shareholder of CLESCO and held the only propriety interest in it; no corporate minutes were kept; the other

officers of CLESCO existed solely to accommodate him, who solely directed its affairs; only he could deal with corporate funds; and CLESCO filed no corporate business tax returns. On these facts this court sustained the trial court's conclusion imposing individual liability on Neustadt.

In *Zaist* the corporation, East Haven, Inc., had been in existence and engaged in the construction business for eleven years before the plaintiffs did business with it. The plaintiffs were unaware of or indifferent to the corporation's control by Olson, did some of their business with it under written contracts and undertook, in the transaction in question, to deal with it. East Haven, Inc. maintained an office and checking account, kept corporate and financial records, filed corporation returns and had employees. Approximately $2,350,000 of construction mortgage funds were supplied by Olson or his other corporations to East Haven, Inc., which was used to pay the plaintiffs and other contractors for their work and materials on three parcels of land. The plaintiffs' bill was $193,000, of which $170,000 was paid by East Haven, Inc. Despite all these facts this court sustained, over two strong dissents (*House and Cotter, Js.*), the trial court's conclusion imposing individual liability on Olson.

The facts of *Saphir* indicate to me no greater degree of dominance and improper use of the corporate form by an individual for his own ends than is present here. The facts of *Zaist* indicate to me a greater degree of adherence to corporate form and to the business norms of closely held corporations, and a lesser degree of justified reliance by the claimants for payment on the individual's

resources, than are present here. Yet the majority holds in this case that the plaintiffs have not even made out a weak prima facie case. I disagree.

Therefore I dissent.