[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff has filed for a dissolution of her marriage with the defendant. Based upon the evidence presented, the court makes the following findings and issues the following orders.
The plaintiff and the defendant married on January 1, 1982. There is one minor child, Rebecca, born on February 2, 1989, who is issue of the marriage. The plaintiff has continuously resided in the State of Connecticut for at least twelve months prior to bringing this action. The marriage has broken down irretrievably.
The plaintiff is forty-nine years old. She is in good health. She has a bachelor's degree from Eastern Connecticut State University. For the first seven years of the marriage, the plaintiff worked full time as a personnel manager for a number of companies. She stopped working in 1989 when Rebecca was born. The plaintiff remained at home to care for Rebecca. She also assisted the defendant in his business. The plaintiff returned to work on a part time basis in the fall of 1994 when Rebecca entered kindergarten.
The plaintiff is currently a part time student in the masters' program for early childhood education at Southern Connecticut State University. She has recently been employed as a special education paralegal in the Guilford public schools and she has tutored students during the summer months. Commencing in September of 1996, the plaintiff will begin, pursuant to her masters' program, student teaching full time. She will not be paid for her work as a student teacher. The plaintiff is in good health.
The defendant is fifty years old and also is in good health. He has a bachelor's degree from Wright State University. He is currently employed as an accountant. He operates his own accounting business out of the marital home. The business, now known as Connecticut Accounting and Business Systems, Inc., operated as a sole proprietorship from 1988 until June 12, 1995 when the business was incorporated.
The primary activity of the defendant's business is the preparation of income tax returns and financial statements. He also sells accounting software and provides consulting services with respect to such software.
The parties have had a marriage of substantial length, CT Page 6124 exceeding 14 years. The court finds the defendant at fault for the breakdown of the marriage. During the course of the marriage, the defendant was dictatorial and controlling. He was also verbally abusive to the plaintiff, calling her derogatory names and belittling her. The plaintiff' suffered in silence for many years in the hope of preserving the marriage because of their daughter. Ultimately, the defendant's inappropriate behavior resulted in the complete and irretrievable breakdown of their relationship.
The primary issue in dispute at trial was custody of Rebecca. The plaintiff seeks sole custody of Rebecca with visitation by the defendant every other weekend and one weekday. The defendant requests joint custody and a continuation of the pendente lite arrangement whereby physical custody of Rebecca is shared equally.
The current custody arrangement has been in effect pursuant to an agreement of the parties since June 1, 1995. Pursuant to this pendente lite agreement, the parties have joint legal custody of Rebecca with shared physical custody. Rebecca resides with the plaintiff from Saturday evening until Wednesday afternoon. Rebecca resides with the defendant from Wednesday afternoon through Saturday evening.
The defendant maintains that the present custody arrangement has worked well and is in the best interests of Rebecca. The plaintiff asserts that the current agreement was extorted by the defendant, has not functioned satisfactorily, and is not in Rebecca's best interests.
In order to fully appreciate the current custody arrangement, it is necessary to review its genesis. On May 26, 1996, the plaintiff decided to physically separate from the defendant and to serve him with divorce papers. Without notifying the defendant, she left the marital home with Rebecca. They went to Old Saybrook for the day and stayed at a motel that evening. On May 27, the plaintiff and Rebecca visited a friend of the plaintiff's mother in Niantic. The defendant, after searching for the plaintiff, found them there. After a discussion between the parties, including a dispute involving the defendant's handguns that the plaintiff had taken with her, the defendant left. Rebecca remained with the plaintiff at the home of the plaintiff's mother. CT Page 6125
Rebecca returned to school on May 31. In the midst of the school day, the defendant, without notifying the plaintiff, arrived at school and picked up Rebecca. The plaintiff was subsequently notified by the school principal that the defendant had taken Rebecca out of school.
Later that day, the plaintiff spoke with the defendant by telephone.[1] During their conversation, the defendant told the plaintiff that he would keep Rebecca at his home and not allow her to attend school until the plaintiff signed a custody agreement giving him equal custody. He also stated that he would not let Rebecca see the plaintiff nor let her resume any of her normal activities until such a custody agreement was signed. The defendant demanded physical custody of Rebecca fifty percent of the time and he specified the details of the agreement. The current pendente lite custody agreement was prepared and signed the next day, June 1, 1996. It embodied the terms set forth by the defendant.
The plaintiff was coerced into agreeing to a shared custody arrangement. She did not voluntarily sign the pendente lite custody agreement. She did so in order to spare Rebecca the trauma of not going to school or participating in her usual daily activities.
The court finds that it is in the best interests of Rebecca that the plaintiff be awarded sole custody, with rights of reasonable visitation provided to the defendant. The court's determination is based upon a number of factors.
Phyllis Cummings-Texeira of the Office of Family Relations conducted a custody evaluation in this case which was completed on January 29, 1996 and submitted to the court at trial. Ms. Cummings-Texeira concluded that "given the parents' polarized views and their level of conflict, joint physical custody is not a viable parenting option." The custody evaluation report recommends that the parties be awarded joint legal custody with final decision-making authority with the plaintiff and that primary physical custody be given to the plaintiff. The report recommends that the defendant be given visitation three weekends per month and one weekday per week.
Based upon the evidence introduced at trial, the family relations report appropriately concludes that the parties' polarized views and their level of conflict thwart any workable CT Page 6126 joint physical custody arrangement. The parties hold divergent views on a host of important issues related to Rebecca, including schooling, psychological counseling, religious instruction, discipline, and medical care. The parties are also unable to keep their own conflicts and disputes from interfering with their parenting of Rebecca. These contrasting views and this conflict counsel against joint legal custody as well as joint physical custody.
In addition, the current shared custody arrangement has not worked well for Rebecca. The change in custody in the middle of the week has been difficult for her. Ms. Cummings-Texeira, based upon her review, concluded that the shared physical custody arrangement was causing conflict and confusion for Rebecca and it was not working.
Cindy Biestek, Rebecca's first grade teacher, testified that transitions are trying for Rebecca. It is hard for her to leave one task and go to the next. She testified that the midweek custody shift has been a problem for Rebecca and that elimination of the midweek transition would benefit Rebecca educationally. Ms. Biestek also testified that the ongoing conflict between the parents has caused Rebecca to often become sad, to sit alone, and to have difficulty interacting with other children. Rebecca's sadness is particularly pronounced on Wednesdays when the custody transition occurs.
The plaintiff was Rebecca's primary caregiver prior to the inception of the existing custody arrangement. For six of Rebecca's seven years, the plaintiff was primarily responsible for her upbringing. She fed, clothed and bathed Rebecca and planned her activities. Through her past conduct, she has shown that she considers Rebecca's best interests to be her highest priority. She also recognizes the importance to Rebecca of Rebecca maintaining a meaningful relationship with her father.
The defendant, on the other hand, has shown through his prior conduct that his actions with respect to Rebecca's care are often not motivated by Rebecca's best interests. While a loving and caring father, the evidence submitted at trial revealed numerous instances where the defendant was blind or indifferent to the adverse impact his actions could have on Rebecca.
To cite some examples, the defendant wrote a confrontational letter to Rebecca's pediatrician that caused her to lose the CT Page 6127 services of the doctor she had had since birth. He was also careless in his actions with respect to Rebecca's asthma. He continued to smoke cigarettes in the house and he refused to provide her with appropriate medication. He failed to keep his handguns in a locked storage area. They were kept in an open bowling bag under his desk, easily accessible to his child. The defendant also forced the plaintiff to resign as a troop leader for Rebecca's Brownie troop because it met on a day when the defendant had custody. He was unable to prevent his anger toward the plaintiff from undermining what was best for Rebecca.
All of these instances and others indicate that the defendant will not consistently act in a manner that promotes Rebecca's best interests.
Finally, the court finds, based on the plaintiff's testimony, that Rebecca would prefer to spend all five week days with her mother. Although Rebecca is still young, she is a bright and articulate child and capable of forming an intelligent preference. See Conn. Gen Stat. § 46b-56(b).
Another area in dispute at trial was the defendant's income. The parties had sharply divergent views on the profitability of the defendant's accounting practice.
On financial issues, the defendant's testimony was consistently not worthy of belief. Throughout the course of these proceedings, the defendant misrepresented his financial situation.
For example, the defendant testified that he did not file an individual federal tax return for 1994 or 1995. He stated under oath that he was not required to file a federal return because he earned net income of less than $400 in each of those years. He subsequently admitted under cross examination that the requirements governing the filing of a federal tax return were based on gross income and required that he file a return. His professed ignorance of the tax laws was unbelievable in light of his occupation as an accountant whose primary business was the preparation and filing of income tax returns.
As another example, the defendant misrepresented his personal expenses on his financial affidavit. The affidavit filed with the court indicated that the defendant was personally paying for his own medical insurance. The defendant also testified that he was CT Page 6128 paying for the insurance and that he was not reimbursed by his corporation. The evidence presented to the court, however, clearly showed that the corporation was paying for the defendant's medical insurance.
The defendant was not truthful about his income. He testified that his accounting business generated gross income of $66,000 in 1994 and 1995. However, he claimed that he received next to nothing from his employment by the corporation, his net income from employment constituting less than $400 annually. He asserted that his primary source of income was $508 per week or approximately $26,500 per year which he received from the leasing of personal property to his corporation.
The defendant attempted to evade his financial responsibilities to provide support to the plaintiff by conducting his accounting practice through a corporation. Prior to the filing of the dissolution action, the defendant operated his accounting business as a sole proprietorship. Approximately two weeks after he was served with the divorce writ, summons and complaint, he established the corporation and transferred his business to that entity.
A corporate entity can be disregarded in situations where it is so dominated and controlled by an individual that equity demands it. Angelo Tomasso. Inc. v. Armor Construction andPaving, Inc., 187 Conn. 544 (1982). "When the statutory privilege of doing business in the corporate form is employed as a cloak for the evasion of obligations, as a mask behind which to do injustice, or invoked to subvert equity, the separate personality of the corporation will be disregarded." Falcone v. NightWatchman, Inc., 11 Conn. App. 218, 220 (1987) (Citations omitted). The corporate veil may be pierced when it is being used as a instrumentality to commit fraud or wrong or when the identity of the corporation is inseparable from the individual See Angelo Tomasso, Inc. v. Armor Construction and Paving, Inc.,
supra, 553-554 for the elements of the "instrumentality" rule and the "identity" rule.
The corporation, Connecticut Accounting and Business Systems, Inc., is completely dominated and controlled by the defendant. It has no separate independence or existence. The defendant is the corporation's only employee. He is the president and chairman of the board. The defendant and his seven year old daughter, Rebecca, are the corporation's only officers and its only CT Page 6129 directors. According to the defendant, his daughter owns 99.9% of the stock and he owns 1/10 of 1%. He admitted at trial that he has total control over the affairs of the corporation.
The corporation has no assets. Its equipment is leased from the defendant. The corporation's office is in the marital home, a portion of which it ostensibly leases from the defendant. The only signatures on the leases are the signature of the defendant on behalf of himself and his signature on behalf of the corporation. The funds of the corporation are commingled with the defendant's personal funds in one checking account.
The corporation in this instance is a mere shell. It serves no legitimate purpose and is being used solely to shelter the defendant's income from his support obligations. As a result, the corporate entity should be disregarded under both the instrumentality and the identity rules. See United ElectricalContractors, Inc. v. Progress Builders, Inc., 26 Conn. App. 749
(1992). The income of the corporation should be considered the income of the defendant.
A party to a dissolution proceeding has the obligation to file a sworn financial affidavit that discloses his or her income and expenses. Practice Book § 463. The duty is one of full and frank disclosure of financial information. Billington v.Billington, 220 Conn. 212, 219-220 (1991).
The defendant did not comply with this essential obligation. He lied about his income and his personal expenses. He provided no specifics as to his business expenses.
Because the defendant failed to fulfill his disclosure obligations, the court was provided with no creditable basis upon which to find reasonable and necessary business expenses. Under the child support and arrearage guidelines, only "legitimate" expenses may be deducted from earnings from self-employment. Section 46b-215a-1(11)(a)(ix). Since no evidence of legitimate or reasonable business expenses was provided, none can or should be deducted from the defendant's gross income. The defendant should not benefit from his failure to disclose his business expenses.
Moreover, the court can and does infer from the failure to provide creditable evidence of legitimate or reasonable business expenses that there are no such expenses. See Glinski v. Glinski,26 Conn. App. 617, 623 (1992), for the proposition that the court CT Page 6130 may draw an adverse inference from the failure of a party to submit the required financial information.
The court finds the defendant's gross income from his accounting practice to be $66,000 annually. Since the defendant failed to provide evidence of appropriate business expenses and admitted to not having paid federal or state income taxes on his income during the current year and for the past two years, I also find $66,000 to be his net annual income. See Martone v. Martone,28 Conn. App. 208 (1992).
The court finds that the plaintiff has an earning capacity of $184 weekly. This finding is based on the net income from her most recent employment with the Guilford public schools.
The parties have few assets. The marital home at 328 County Road in Madison is in the plaintiff's name, the defendant having quitclaimed his one-half interest to her in 1987. The fair market value of the property is $225,000. There is no equity in the property as it is encumbered by mortgages and liens totalling approximately $478,000.
The defendant has a small pension plan with a value of $2,000. He also owns a boat valued at $3,000 and a 1988 Lincoln Town Car also valued at $3,000.
The only substantial asset of the parties is the balance remaining in the checking account maintained by the defendant for his business and personal use. The defendant testified that $18,000 existed in the account at the time of trial. Included in these funds is $10,000 which represents the proceeds of the sale of the parties' Saturn automobile. The Saturn was used primarily by the plaintiff during the marriage and was purchased with funds gifted to the parties by the defendant's mother.
In determining the orders contained herein, I have carefully considered all the relevant statutory criteria, including those contained in Conn. General Statutes § 46b-56 as they relate to custody and visitation, § 46b-81 as they relate to the assignment of property, § 46b-82 as they relate to the award of alimony, and § 46b-84 and the child support guidelines as they relate to the award of child support. The court enters the following orders:
1. The marriage is ordered dissolved on the grounds of CT Page 6131 irretrievable breakdown.
2. The plaintiff is awarded sole custody of the minor child, Rebecca.
3. The defendant is awarded the following visitation:
 a. Every other weekend from Friday at 5:00 p. m. until Sunday at 7:00 p. m.;
b. every Wednesday from 4:00 p. m. until 7:30 p. m.;
c. Father's Day and the defendant's birthday
 d. the following holidays in even numbered years: New Year's Day, Memorial Day, Labor Day and Christmas Day;
 e. the following holidays in odd numbered years: July 4th, Thanksgiving and Christmas Eve;
 f. one day of each major Jewish holiday from 10:00 a.m. until 5:00 p. m. if there is no school scheduled and from 4:00 p. m. until 7:30 p. m. if school is scheduled;
g. three weeks in the summer, two of which may be consecutive.
 Similarly, the defendant's visitation shall be suspended for two consecutive weeks in the summer for the purpose of the plaintiff taking a vacation with the child.
4. The defendant shall pay child support to the plaintiff in the amount of $233 per week. This amount is in accordance with the child support guidelines based upon a net weekly income of $184 for the plaintiff and $1,269 for the defendant. It also credits the defendant with a health insurance premium adjustment pursuant to the guidelines of $16 weekly representing that portion of the medical insurance premium he pays for Rebecca. The child support order is made retroactive to March 4, 1996 pursuant to an agreement of the parties.
5. The defendant shall pay periodic alimony to the plaintiff in the amount of $200 per week for a period of five years. Alimony shall terminate upon the remarriage of the plaintiff, the death of either party or the cohabitation by the plaintiff pursuant to Conn. General Statute § 46b-86(b). The alimony CT Page 6132 order is made retroactive to March 4, 1996 pursuant to an agreement of the parties.
6. The defendant is awarded sole ownership of the marital home at 328 County Road, Madison, Connecticut. The plaintiff shall convey her interest in the property by quitclaim deed within thirty days of the date of this decision. The defendant shall be solely responsible for paying the mortgages, taxes and liens on the property. The defendant shall hold the plaintiff harmless and indemnify the plaintiff with respect to any and all mortgages, liens and encumbrances on the property.
7. The defendant shall pay the plaintiff $5,000 as a property distribution. Payment shall be made within one week of the date of this decision.
8. The defendant shall retain sole ownership of his pension fund, the Lincoln Town Car and his boat.
9. Each of the parties shall be solely responsible for payment of the liabilities listed on their respective financial affidavits.
10. The defendant shall maintain medical insurance for the benefit of the minor child until such time as medical insurance for the child is available to the plaintiff at no cost through her place of employment. The parties shall share equally any uninsured or unreimbursed health expenses, including medical, dental and psychological expenses.
11. The defendant shall provide the plaintiff with a copy of his personal federal income tax return and a copy of any federal income tax return for his corporation and any other entity through which he shall hereafter conduct any business within two weeks of their filing. This obligation shall end upon the termination of the defendant's duty to pay alimony and child support.
12. The defendant shall indemnify and hold the plaintiff harmless with respect to any sums owed the Internal Revenue Services (IRS) or the Connecticut Department of Revenue Services (DRS), including any outstanding taxes, penalty or interest due the IRS or DRS as a result of the failure to file income tax returns or the fraudulent filing of income tax returns during the course of the marriage. CT Page 6133
Jon M. Alander, Judge