MEMORANDUM OF DECISION
On September 23, 1999, the Department of Children and Families, hereafter "DCF", filed a petition for the termination of the parental rights of Sherone H. and Emery McC. To their daughter, Chyna H. The trial on the pending petition was held over three days, May 30, May 31 and concluded on June 1, 2000. The biological father, Emery McC., consented to the termination of his parental rights at the commencement of the trial. The court found that his consent was knowingly and voluntarily made, with the advice and assistance of competent counsel. The court accepted his consent. The petition was then amended to reflect his consent.
For the reasons set forth below, the court grants the termination petition as to Sherone H. as she has failed to rehabilitate so that she could parent this child within the statutory meaning of those terms. Connecticut General Statutes § 17a-112 (c)(3)(B). Also alleged was there was no ongoing parent-child relationship, pursuant to Connecticut General Statutes § 17a-112 (c)(3)(D). The court dismisses the petition as to this ground.
From the evidence presented, the court finds the following facts:
 A. FACTS
Chyna H. was born on October 12, 1997. At birth she tested positive for cocaine. Her mother, Sherone, tested positive as well and had also tested positive for cocaine during a prenatal visit two and one half months earlier. DCF has had previous involvement with Sherone and her oldest child and knew that Sherone had significant mental health problems as well as substance abuse difficulties. DCF applied for and secured an CT Page 6909 order of temporary custody on October 16, 1997.(Keller, J.) Chyna was adjudicated neglected on November 2, 1997 and committed to the care and custody of DCF. She has remained in foster care all of her life and has never been in the day-to-day care of her mother.
1. Sherone H., the mother.
Sherone is now thirty-seven years old. She graduated from high school and has claimed that she attended various post high school programs for further education, which have not been verified. Her relationship with her mother was and continued to be conflictual. Her work history is also unclear, as at various times she claimed to work for the FBI and the CIA or agencies related to them and various other organizations, which claims were not believable. She has held jobs and left jobs and is able to work. Her general secretiveness regarding her past life makes verification of much information difficult.
Her oldest child, Ja'Coun, was born in 1986, when his mother was twenty-three. He remained in her care until he was nine, when he was removed from her care, due to allegations of physical abuse suffered at the hands of his mother. At the time of this investigation, it was discovered that Sherone was involved in witchcraft. Lighted candles were found in the home as well as many books on witchcraft. Sherone herself has verified that she has been involved in witchcraft since she was fifteen. At what point she became involved with Emery McC., the father of Chyna, is not known and the details of her life with him are uncertain. What is known is that both she and Emery have been involved with substance abuse. The relationship between Sherone and Emery was full of conflict. At the time of Chyna's birth, Sherone and Emery were not living together. In 1998, when Chyna was in the custody of DCF, Sherone sought a restraining order against Emery and stayed in a Women's Shelter to avoid him. She told the social worker that she was afraid of him, although Emery indicated otherwise.
(a) Psychiatric evaluations
Dr. Walter Borden psychiatrically examined Sherone and prepared reports of his findings, both in January, 1996 and in June, 1999. He performed a competency evaluation on the morning of trial, found her to be competent, and testified at trial. Dr. Borden confirmed that Sherone had told him of her interest in witchcraft from a young age and that she believed she possessed special powers. He emphasized that she was a completely unreliable historian of the events in her life. Nothing she reported could be taken as established and everything needed to be verified, he noted. In 1996, he diagnosed Sherone as suffering from schizoaffective disorder. He noted that Sherone "is a mentally ill person who experiences CT Page 6910 delusions of grandeur, auditory and visual hallucinations."[2] He noted at that time that there is "a very strong denial of mental illness which is associated with an absolute refusal of significant treatment." At that time, he believed that medications were in order, including "antidepressant medication, neuroleptics, and probably Lithium." He also noted her absolute refusal to consider this form of treatment.
In his 1999 evaluation, Dr. Borden noted that Sherone remained mentally ill with schizoaffective disorder. He observed that she remained "suspicious, guarded, evasive and vague, with suggestions of delusions of grandeur." He ruefully testified that there was some improvement, in that Sherone appeared to have a better understanding of what others thought were symptoms of her mental illness and to hide and deny those symptoms. He noted that she had not previously possessed this level of awareness in 1996. At trial, he noted this continued to May 30, 2000. He stated that she was mentally ill and because she will not accept significant treatment, her prognosis is poor. He stated: "There is no doubt that she is mentally ill. She cannot accept this."
Her mental illness, in his opinion, interferes with her ability to raise a child. "Her judgment about herself is impaired and it would therefore be risky for young children to be placed in her care. She is more likely to hide things and less likely to admit to symptoms she knows people react to." He defined her diagnosis as consisting of two conditions, both a thinking disorder and a mood disorder. The mood disorder, he noted, is a depressive disorder. "her symptoms involved delusions of grandeur. Her belief that she had special powers actually reflect feelings of powerlessness and depression. This is", he noted, "a way of overcoming feeling bad. Also she has visual hallucinations and auditory hallucinations and reported that she hears people crying." In his experience, such hallucinations are an indication of depression.
As to the schizoid portion of the diagnosis, this is tested by testing cognitive functioning. When Dr. Borden did so, Sherone gave typically schizophrenic responses. This indicated, he noted, "that she has difficulty in abstraction, and this difficulty has continued from January 1996 through today." He noted that cocaine use plays into the disorder that she has as "cocaine aggravates schizophrenia. It interferes with thinking and with the brain hormones that are involved in the disease." In his opinion, in order to consider placing any child in her care, Sherone would need to have been engaged in serious treatment for a year, including following a medication regime, before he could even assess her condition from this point of view. He agreed that her prognosis was bleak and that "she has a serious mental illness, an inability to accept it and therefore an active need to deny it and not comply with treatment." She also does "not really understand why the child was removed from her. She CT Page 6911 did not feel she was doing anything harmful or wrong with the child. There is no awareness of the impact she had on her child." He stressed the need to secure independent verification about the progress of any treatment. In view of the length of time the child had already been in care, he was concerned about the time. He stated: "you cannot wait forever." He was not prepared to state what was in Chyna's best interests as he had not seen the mother with the child nor assessed the strength of the bond the child had with her foster parents.
(b) Visitation
The DCF social worker responsible for the case from May, 1998 to November, 1998 testified as to the visitation she observed and supervised through her social services assistant. At that time, the visitation with Chyna was supervised at the DCF offices. She reported that: "it was difficult for Mom to pacify her. She has a hard time engaging with her. Chyna would cry for long periods of time and a couple of visits were stopped because Chyna was crying inconsolably. Mother would get very anxious when the child was crying. There were difficulties in her being able to soothe the child and bond with her."
Sherone also requested more time with her daughter. Because Chyna was placed with her paternal aunt, DCF offered to have Sherone go to the foster home, as perhaps that would be easier for her in a more normal setting. "Sherone did not want to do that, she did not want any part of that and changed her opinion." In July, 1998, DEC reviewed the visitation plan and decided to have visitation twice a week with the foster mother to come and fill the mother in once a week about the child's status. This ended because Sherone did not want (the foster mother) to be part of the visits."
The social worker noted that Sherone was unable to accept any parenting advice or assistance from her. "She became resistant to redirection." The social worker also noted that although Sherone had been referred to a parenting education course and had completed that course, she had a hard time understanding child development. She concluded Sherone did not acquire many parenting skills. Although she stated that Sherone was cooperative with her, she also testified that she sometimes got loud and verbally threatening. There were areas of her life she would not speak about, especially her mental illness. Sherone did not feel she needed treatment and she was not willing to sign releases so that DCF could monitor the psychiatric counseling she did receive. The social worker's testimony regarding Sherone's secretiveness and her refusal to address her mental illness was consistent with Dr. Borden's observations.
In December 1998, DCF determined it would be appropriate to review an CT Page 6912 assessment of Sherone's parenting and to provide her with some direct hands-on instruction while visiting with Chyna. As Sherone and her mother complained about the visits at the DCF offices, DCF set up visitation through AMPS, an independent supervised visitation center in Vernon, Connecticut. Ms. Tuller, the director and part owner of the center, testified concerning her observations and her ultimate conclusion that visitation between Sherone and Chyna should be terminated. She stated that between December, 1998 and the present time, there were a total of twenty-one visits set. Sherone only attended nine, although some were cancelled by DCF. Detailed logs of all the visits were kept and show a progressively deteriorating relationship between Sherone and Chyna, although the most recent visit on May 20, 2000 was "the best she ever had," according to Ms. Tuller.
In her opinion, based on the visits she observed, Sherone had poor parenting skills. She defined the parenting role as "providing a role model for the child, being intellectually stimulating to a child and able to parent in a way that is conducive to a positive and stable growth pattern. She cannot provide that kind of parenting." She described many of the visits as a "tug of war" between Chyna and Sherone. Often, when Chyna tried to play with a toy, Sherone would take it away from her. She would require Chyna to say "please" and then require her to play with another toy. Sherone expected behavior from Chyna that the child was not developmentally able to provide and would not modify her inappropriate requirements in the face of crying and screaming by the child. Ms. Tuller concluded that there was no benefit to these visits, which would reduce Chyna to tears and to screaming at her mother, whose response was to scream back. Sherone's entire purpose appeared to be to "aggravate Chyna." Ms. Taller concurred with the social worker's observations that Sherone was resistant to redirection. She stated that at times Sherone "goes into rambling comments about what she is trying to do and how she is trying to teach the child. Until she is finished, you cannot interrupt it." Her concern was what focus could Sherone have on the child while this was happening. She noted that Sherone acted in ways consistent with other mentally ill people she had known. She concluded that Sherone could not care for Chyna and she was concerned for Chyna's physical safety as well.
(c) Compliance with Expectations
In 1997, when services were first offered to Sherone in connection with the expectations entered for her, Sherone did not sign releases and DCF was unable to verify the details of her substance assessment and the recommendations for further treatment. In the spring of 1998, she was discharged from the substance abuse program, Genesis Center, because of her non-compliance with treatment. The program reported to the DCF worker that Sherone was disruptive in the group sessions, insisting that she had CT Page 6913 the right to express her self even if she is interrupting her peers and/or the group process."[3] The program worker noted that Sherone "is very difficult to direct." Also, the Center had difficulty about getting urine screens from her. She was not cooperative with the psychiatric services and treatment recommendations made for her by Genesis in the past.
After her discharge from this substance abuse program, Sherone began treatment at the Community Health Services drug program, took parenting classes and completed them and attended all visits with Chyna offered by DCF. She acknowledged her use of cocaine. She was much more cooperative with services. By September 22, 1998, the program reported to the DCF worker that "Ms. H. has shown a great deal of improvement in her attitude and her motivation."[4] However, Sherone continued to refuse permission for DCF to learn about her counseling and her psychiatric assessment while in the drug program. The DCF worker noted that Sherone also remained secretive about her employment and her relationship with Emery McC., the child's father. At the time this DCF worker left the case in November, 1998, Sherone was still involved in the substance abuse program. The program records indicate that Sherone had urine screens from July 27, 1998 through January 4, 1999. After January 4, 1999, she did not continue to participate.
The new worker assigned to the case noted that she was never able to obtain releases about these programs from Sherone during her time on the case. She stated that Sherone had. to her knowledge, been referred to Genesis Center twice and once to the Institute of Living, She had never complied with the expectations set for her regarding substance abuse treatment and mental health treatment, the central concerns DCF has about her parenting and ability to care for Chyna. This refusal, the court notes, was consistent with Dr. Borden's testimony that an important component of Sherone's mental illness is her inability to admit she has any such difficulties.
Sherone's refusal to engage in treatment has continued without change. The DCF social worker also noted that, during a conversation with Sherone on February 7, 2000, Sherone stated to her that she has no substance abuse or mental health problems. Because there were no problems, she did not require treatment. The court finds, from the clear and convincing evidence, that Sherone was ultimately unsuccessful in addressing her mental health difficulties and substance abuse, the central difficulties confronting her in her attempts to parent Chyna.
The worker testified that at times Sherone's whereabouts were unknown to DCF and that messages were relayed to her through her mother. The worker never visited Sherone in any home that she had. Sherone, however, CT Page 6914 did maintain regular contact with DCF and attended all treatment plan conferences, except the most recent one. In addition, Sherone was required to maintain housing, which at times, she did not do. It was unclear where she was residing after August 1999, as she had a month-to-month lease, which ended with a vacancy report on August 23, 1999.[5] No information was ever verified concerning her employment.
3. The child, Chyna H.
Chyna is not yet three years old. She was placed with her paternal aunt and her husband on November 22, 1997. about a month after she was removed from her mother. She has done well in this home where there are no other children. She sees her foster mother's relatives, neighbors and her other brothers and sisters. When she and the foster parents are out in the community with others, sometimes either her biological father or mother will also be present, so she has seen them as well, outside of the regular visits. The foster mother testified that Chyna knows who her biological parents are and that she has told Sherone that if Chyna is not returned to Sherone, she will keep her and raise her. She and her husband wish to adopt Chyna, if she is freed for adoption.
The DCF social worker noted that Chyna has a wonderful relationship with her foster parents. They are visibly her psychological parents and have done a wonderful job in caring for this child. They have given Chyna everything that she needs. The DCF worker testified that it was in Chyna's best interests to have her parents' rights to her terminated and to be adopted by her paternal aunt and uncle.
 B. MOTION TO DISMISS
Connecticut Practice Book (Rev. 1998) § 15-8 permits the court to dismiss a case "whenever it determines that, after the plaintiff has produced his evidence and rested his cause, the plaintiff has presented insufficient evidence to establish a prima facie case against the defendant." Season-All Industries, Inc. v. R.J. Grosso, Inc., 213 Conn. 486,493, 569 A.2d 32 (1980). In considering and ruling on a motion to dismiss, the court must determine whether "sufficient evidence has been submitted to raise an issue to go to the trier of fact." New England Savings Bank v. Bedford Realty Corp., 246 Conn. 594, 608, 712 A.2d 713
(1998). "The evidence must be such that, if credited, it would be sufficient to establish the fact or facts it is introduced to prove." Berchtold v. Maggi, 191 Conn. 266, 270, 464 A.2d 1 (1983). In evaluating the motion, the plaintiffs evidence "is to be taken as true and interpreted in the light most favorable to [the plaintiff], and every reasonable inference is to be drawn in [the plaintiffs] favor." Angelo Tomasso, Inc. v. Armor Construction and Paving, Inc., 187 Conn. 544, 548, CT Page 6915447 A.2d 406 (1982). "A plaintiff has failed to make out a prima facie case "when the evidence produced by the plaintiff, if fully believed, would not permit the trier in reason to find the essential issues on the complaint in favor of the plaintiff." Rosenfield v. Cymbala,43 Conn. App. 83, 91, 681 A.2d 999 (1996), citing Minicozzi v. Atlantic Refining Co., 143 Conn. 226, 230, 120 A.2d 924 (1956).
The respondent mother claims that the petitioner has failed to establish a prima facie case on all grounds alleged. Viewing the evidence in the light most favorable to the petitioner, the court concludes that this claim is without merit. The court concludes that the Petitioner established a prima facie case as to Sherone's failure to rehabilitate and that there is no ongoing parent-child relationship.
 C. ADJUDICATORY FINDINGS 1. Reasonable Reunification Efforts.
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts . . . provided that this finding is not required if the court has determined at a hearing . . . that such efforts are not appropriate." Connecticut General Statutes Section 17a-112
(c)(1). The petitions allege that DCF has made reasonable efforts to reunify the family, but that Sherone is unable or unwilling to benefit from such services.
The court finds, from the clear and convincing evidence, that DCF made more than reasonable efforts to reunify Sherone with her daughter. Further, the court finds from the clear and convincing evidence, that she has been both unable and unwilling to benefit from those services as she does not engage in them. In addition, the record of this case and testimony shows that the court on September 4, 1999 found that further reunification efforts between Sherone and Chyna were inappropriate. (Keller, J.)
1. Sherone H.'s Failure to Rehabilitate
Chyna was adjudicated a neglected child on November 7, 1997. The court further finds, by clear and convincing evidence, that as of the date of the filing of the termination petition in September, 1999, Sherone H. had not achieved such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, she could assume a responsible position in the child's CT Page 6916 life. Connecticut General Statutes Section 17a-112 (c)(3)(B). "Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent." Inre Migdalia M., 6 Conn. App. 194, 203, 504 A.2d 532 (1986), see also Inre Juvenile Appeal, 1 Conn. App. 463, 477, 473 A.2d 795 (1984). The evidence clearly demonstrates that she has not been able to confront the central issues keeping her from being able to adequately parent Chyna, her mental health and substance abuse.
The statutory framework requires the court to analyze the parent's rehabilitation "as it relates to the needs of the particular child" and consider if such rehabilitation is foreseeable "within a reasonable time."In re Luis C., 210 Conn. 157, 1167, 554 A.2d 722 (1989), In re Hector L.,53 Conn. App. 359, 366-367, ___ A.2d ___ (1999). Because of this requirement that the court predict what may happen within a "reasonable time" after the filing of the termination petition, the court must consider not only the parent's conduct prior to the filing of those petitions, but also the conduct since that time.
Sherone, through her counsel, argues that she is again receiving individual counseling and that within a year's time, she might be prepared to care for her child. Nonetheless, although Sherone is again in treatment, this fall it will have been three years since DCF required her to address both her mental health and substance abuse issues in order to have Chyna in her care. She has not done so. She has never accepted any medication for her mental conditions. She continues to deny to the present time that she has any need for treatment.
Chyna requires permanency and a stable home in which to prosper and grow. Her biological mother cannot provide such a home and the care this child needs. Sherone is no closer now to meeting this child's needs than she was in 1997, shortly after Chyna was born. The situation has continued without change for Chyna's entire life. She cannot wait an additional year for the court and the experts to assess the circumstances once again. To require Chyna to wait an additional year is not reasonable nor in her best interests, given all the time that has passed and her mother's patent lack of progress. The court concludes, from the clear and convincing evidence, that Sherone has failed to rehabilitate herself.
2. Sherone's Failure to have an Ongoing Parent-Child Relationship withChyna
To succeed on this ground, DCF must show by clear and convincing evidence the absence of "the relationship that ordinarily develops as a result of a parent having met on a day-to-day basis the physical, emotional, moral and educational needs of the child and [that] to allow CT Page 6917 further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child." Conn. Gen. Statutes § 17a-112 (c)(3)(D); In re Savanna M.,55 Conn. App. 807, 815, 740 A.2d 484 (1999). This ground encompasses a situation in which "regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitely lost that relationship, so that despite its former existence it has now been completely displaced." In re JuvenileAppeal (Anonymous), 181 Conn. 638, 645, 436 A.2d 290 (1980) (internal citation omitted). The decisive question is "whether the child has no present memories or feelings for the natural parent." Id. At 646. As the Appellate Court recently noted, "the feelings of the child are of paramount importance." In re Tabitha T., 51 Conn. App. 595, 602,722 A.2d 1232 (1999). "Feelings for the natural parent connotes feelings of a positive nature only." Id.
As noted, the court has found that the petitioner made out a prima fade case of this claim at trial. There was conflicting evidence on Chyna's feelings for her mother. On the one hand, the visitation supervisor at AMPS testified that the visits were of no benefit to the child and that Sherone seemed intent on aggravating Chyna. On the other hand, she stated that the last visit in May, 2000 was the best Sherone and Chyna have ever had in her presence. The foster mother testified that Chyna knows her mother and when they meet outside the home, she will go to her mother and then return to her foster mother. She calls her mother "Mommy Sherone." While it is the case that the court has concluded that it is not in Chyna's best interest to allow her mother more time to establish a relationship with Chyna, the evidence about Chyna's portion of the existing relationship is not clear and convincing. It is difficult to know whether the memories of a two-and-one-half-year-old child are positive or not. There was no expert testimony on this issue. The court refuses to speculate and concludes that this ground in all its elements was not proven by clear and convincing evidence. Indeed, the petitioner did not strenuously argue that it was so. The court dismisses this ground.
 C. REQUIRED FINDINGS
The court makes the following factual findings required by Connecticut General Statutes Section 17a-112 (e):
(1) Appropriate and timely services were provided by DCF to the family. These included many services to benefit Sherone, as previously found. DCF also provided visitation and case management services.
(2) As previously noted, the court finds by clear and convincing CT Page 6918 evidence that DCF made reasonable efforts to reunify the family. Those efforts continued even after the court's finding that further efforts were not appropriate.
3) The terms of any applicable orders entered into and agreed to by any individual or agency and the extent of fulfillment of those obligations. The court has outlined the court expectations. Sherone was not able to minimally fulfill them.
4) The feelings and emotional ties of the child with respect to the parent, any guardian of the person and any person who has exercised physical care, custody and control of the child for at least one year and with whom the child has developed significant emotional ties. As noted, Chyna has a close relationship with her foster parents. While she knows her biological mother, her foster parents are her psychological parents, to whom she looks to provide her care.
5) Finding regarding the age of the child: Chyna will be three on October 12, 2000.
6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions to make it in the best interests of the child to return her to their home in the foreseeable future and (A) the extent to which the parents have maintained contact with the child as part of an effort to reunite the child with them, provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the child. Sherone had visited her child and has kept in touch with DCF to inquire about her. However, as detailed above, the court finds that Sherone has made no changes in her life to accommodate caring for her daughter. The court found that it is not in Chyna's best interests to return the child to her mother in the foreseeable future.
7) Finding regarding the extent to which a parent has been prevented from maintaining a reasonable relationship with the children by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent. No such conduct is noted. DCF has taken many steps for many years to encourage Sherone to rehabilitate, which she has been unable to accomplish.
 D. DISPOSITION
The court concludes, from the clear and convincing evidence, that Sherone H. cannot care for her daughter, Chyna, at the present time nor CT Page 6919 will she be able to do so in the reasonably foreseeable future. The court concludes, from the clear and convincing testimony, that it is in the best interests of Chyna to have permanency and stability in her life. The court further finds that that goal can best be achieved by adoption. The foster mother testified in court during the trial. She and her husband have amply demonstrated their support of Chyna and their desire to adopt her.
Based on the foregoing, the court concludes, from the clear and convincing evidence, that it is in the best interest of Chyna that her mother's rights to her be terminated. Her biological father has consented to the termination of his parental rights. The court finds that it is in Chyna's best interests that his rights be terminated as well. The court therefore orders that a termination of parental rights enter with respect to Sherone H. and Emery McC. The court appoints the Commissioner of the Department of Children and Families the statutory parent for Chyna H. The court directs that the child's present foster parents be given first consideration in adopting Chyna, given the strong connections they have with them. The court further orders that a permanency plan for the children be filed as well as a review plan, in accordance with state and federal law.
Barbara M. Quinn, Presiding Judge Child Protection Session