[721 NYS2d 321]

ARTECH INFORMATION SYSTEMS, L. L. C., Appellant, v TONY TEE et al., Respondents.

First Department, February 15, 2001

APPEARANCES OF COUNSEL

*John J.D. McFerrin-Clancy* of counsel (*Jeffrey M. Eilender* on the brief; *Schlam Stone & Dolan,* attorneys), for appellant.

*Arthur T. Walsh* of counsel (*James G. Marsh* on the brief; *O'Reilly, Marsh & Corteselli, P. C.,* attorneys), for respondents.

## OPINION OF THE COURT

SULLIVAN, P. J.

This is an appeal from the dismissal, pursuant to CPLR 3211 (a) (7), of a complaint for damages arising from the alleged breach of a non-competition clause in a computer service subcontract.

Plaintiff Artech Information Systems, L. L. C. (AIS), a consultant that provides programming, network and other computer services to customers in the tri-state area, routinely hires outside subcontractors to serve as direct service provid-

ers to its customers. Since its principal asset is its customer relations, AIS includes confidentiality and non-competition clauses in its subcontractor agreements.

In early 1993, a division of AT&T (now Lucent Technologies) hired AIS for a computer consulting project, anticipated to be of at least three years duration, the terms of which were set forth in an initial purchase order. AIS, in turn, hired defendant TNT Communications, Inc., as its subcontractor to perform the required services and entered into a Professional Services Agreement (PSA) "as of" October 19, 1993, signed by defendant Tony Tee, as president of TNT. Paragraph 6 of the PSA, in pertinent part, provides:

> "*NON-COMPETITION CLAUSE*—So long as the business relationship exists, [TNT] shall not directly or indirectly, either as a [c]ontractor, employer, consultant, agent, principal, partner, stockholder, corporate officer, director, or in any other individual or representative capacity, engage or participate in any business which is in competition in any manner with the business of AIS. * * *

> "In view of the foregoing, for a period of one (1) year immediately following the ending of this contractual relationship with AIS, and within a radius of one hundred (100) miles (For Client with multiple locations), [TNT] shall not directly or indirectly make known to any person, firm, or other entity, the names, addresses or any other information pertaining to any of the clientele or customers of AIS, or call upon, solicit, take away, or attempt to call upon, solicit, or take away any of the clientele or customers of AIS. [TNT] further agrees that any of its employees whose services are required for successful completion of current assignment, will not seek or accept employment directly or indirectly from AIS's client for the period mentioned above. In case [*sic*] where the client has multiple locations, [TNT's] employees may not seek employment at any location for a period of one (1) year from the termination date of this contract and within a radius of one hundred (100) miles from [TNT's] place of work.

> "In the event that [TNT] does not abide by this Agreement 'not-to-compete', [TNT] shall pay to AIS

a sum of Ten Thousand ($10,000.00) dollars each month as liquidated damages during the period in which [TNT] continues to be in breach of this agreement 'not-to-compete'."

The PSA also provides, in paragraph 19, that it shall be "governed by and construed in accordance with the substantive laws of the State of Connecticut." TNT performed services in furtherance of the PSA for approximately 3½ years, during which AIS paid it approximately $385,000.

AIS provided services to Lucent pursuant to a series of purchase orders. Often, however, in the course of the two companies' dealings there would be a lag between the expiration of one purchase order and the issuance of a new one. In such circumstances, AIS would continue to provide services, and Lucent would subsequently issue a purchase order retroactive to the expiration date of the prior purchase order. On or about July 1, 1997, the purchase order then in effect was due to expire. AIS alleges that when it questioned Tee shortly after that date about the status of a new purchase order, Tee responded that a new purchase order had not yet been issued, but that he was checking on its status. Over the subsequent weeks, AIS alleges, it continued to press Tee for information about the new purchase order and was repeatedly assured that it would be issued soon. AIS further alleges that at the time Tee made these statements he knew them to be false and that, in January 1998, Tee finally confessed that a new purchase order had been issued—to Trilogy Communications, Inc., another of Tee's alter egos—on or about July 1, 1997. This action against TNT, Tony Tee and Trilogy followed.

The complaint alleges that in or about early 1997, in direct violation of paragraph 6 of the PSA, Tony Tee and TNT, his alter ego, began using confidential information they had obtained in the course of their work to persuade Lucent to strip AIS of the project and award it to Trilogy.

The IAS Court granted defendants' motion to dismiss the complaint pursuant to CPLR 3211 (a) (7), concluding that since the non-competition clause was signed only by TNT as the contractor, and as Tee was not the contractor, AIS failed to demonstrate an enforceable contract with Tee that prohibited him from competing with AIS. In addition, the court found that the non-competition clause was not enforceable since it was not limited to a definite time in which a former employee of TNT would be barred from competing for customers and that Trilogy was not a party to the PSA. Thereafter, AIS moved

for reargument and renewal on the ground that TNT was not a legal corporation, never having been incorporated. The court found plaintiff's allegations as to TNT's corporate status "inadequate" and denied reargument.

■ At the outset, AIS argues that the complaint sufficiently pleads alter ego liability and that TNT's conduct should therefore be imputed to Tee. We agree. Under Connecticut law, which, as noted, governs the PSA, the corporate structure may be disregarded and an individual held personally liable as an alter ego of the corporation under either an "instrumentality rule" or an "identity rule." (*See, Angelo Tomasso, Inc. v Armor Constr. & Paving*, 187 Conn 544, 553, 447 A2d 406, 410.)

The instrumentality rule requires proof of three elements: control, that is, complete domination "not only of finances but of policy and business practice *in respect to the transaction attacked* so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own" (*id.*); the use of such control to commit fraud or wrong or to "perpetrate the violation of a statutory or other positive legal duty" (*id.*); and that such "control and breach of duty must proximately cause the injury or unjust loss complained of" (*id.*). Under the identity rule, "[i]f plaintiff can show that there was such a unity of interest and ownership that the independence of the corporations had in effect ceased or had never begun, an adherence to the fiction of separate identity would serve only to defeat justice and equity by permitting the economic entity to escape liability arising out of an operation conducted by one corporation for the benefit of the whole enterprise [citations omitted]." (*Id.*, at 554, at 411.)

The complaint alleges that TNT has no employees, officers or shareholders other than Tony Tee and that he created and maintained TNT solely to facilitate the diversion of the Lucent contract from AIS to Trilogy and as a vehicle to defraud AIS. In addition, the complaint alleges that, at all relevant times, Tee has "dominated and controlled TNT and caused it to act solely for his own benefit, without regard to corporate formalities whereby the assets, income, revenue and profits of TNT are diverted to Tee, and Tee has treated TNT as being part of himself, and has intentionally kept TNT undercapitalized so that it is no more than an assetless shell." This pleading, which, in essence, alleges that TNT "lacked a mind, will or existence of its own" (*Hess v Balfour Co.*, 822 F Supp 84, 86) is sufficient to withstand a CPLR 3211 (a) (7) motion to dismiss

under either Connecticut's identity or instrumentality rule. (*See, id.*)

The result would be the same under New York law. (*See, Trans Intl. Corp. v Clear View Techs.*, 278 AD2d 1 [where plaintiff alleged that the individual defendants are corporation's equitable owners, that corporation was their alter ego, that they exercised complete dominion and control over corporation and that equity requires that they be held liable for corporation's obligations to plaintiff, complaint stated a claim for piercing the corporate veil and holding the individual defendants personally liable for corporation's debts].) Accordingly, the IAS Court erred in concluding that since the PSA was signed only by TNT, AIS failed to demonstrate an enforceable contract with Tee.

In any event, it appears that TNT is not a corporation. In support of its motion for renewal and reargument, AIS pointed to defendants' interrogatory response that "TNT is a de facto New York corporation" and the fact that the New York Secretary of State's office informed its counsel's legal assistant that TNT Communications, Inc., which was incorporated under another name in 1954 and renamed TNT Communications, Inc. in 1966, is the only TNT Communications, Inc. incorporated in New York State. The Secretary of State's representative also informed the legal assistant of the name of the chairman of that corporation and the address of its principal place of business, clearly not that of defendant TNT. Defendants do not dispute and, indeed, essentially concede TNT's lack of corporate existence. While Connecticut recognizes that a de facto corporation can exist "where there is law authorizing such a corporation and where the company has made an effort to organize under the law and is transacting business in a corporate name [citation omitted]" (*Clark-Franklin-Kingston Press v Romano*, 12 Conn App 121, 125, 529 A2d 240, 242, *certification for appeal denied* 205 Conn 803, 531 A2d 935), there is no allegation here that any efforts toward TNT's incorporation have been undertaken. " '[O]ne who contracts in the name of a nonexistent * * * principal, or a principal without legal status or existence, renders himself personally liable on the contract so made.' " (*Snet v Arcangelo*, 1996 WL 87590, *3, 1996 Conn Super LEXIS 318, *6 [Conn Super Ct, Feb. 5, 1996] quoting 3 Am Jur 2d, Agency § 306, at 810.) Accordingly, there is no merit to Tee's argument that he is insulated from liability for breach of the agreement for which only TNT can be held liable.

■ The primary issue on this appeal is the enforceability of the non-competition clause; the heart of defendants' dismissal motion was their claim that since the clause was unenforceable, all causes of action stemming from it must be dismissed. In our view, the clause is enforceable.

Asserting that the complaint alleges that AIS hired TNT "in or about early 1993" and that the agreement containing the non-competition clause was executed after October 19, 1993, defendants contend that there was no consideration for the non-competition clause since it was executed subsequent to the time TNT commenced working on the project. This contention should be rejected. There is no allegation that plaintiff hired TNT "in or about early 1993." While the complaint alleges that Lucent hired AIS "in or about early 1993," it alleges, as to TNT, only that AIS "determined to use a subcontractor" and therefore entered into an agreement with TNT—the PSA—on or about October 19, 1993. Indeed, the affidavit of AIS's president states that defendants' claim that "Tee and TNT began work for [AIS] * * * on September 1, 1993, prior to Tee's signing of the [PSA] * * * is completely false. Tee and TNT began work on October 19, 1993, the same day Tee signed the agreement." Attached to that affidavit is the first invoice submitted by TNT—"Invoice #: 1001"—which also indicates that Tee and TNT began work on the project on October 19, 1993.

The non-competition clause prohibits TNT, "[s]o long as the business relationship exists," from "engag[ing] or participat[ing] in any business which is in competition * * * with the business of AIS." In light of our conclusion as to alter ego liability, TNT's conduct can be imputed to Tee. Therefore, this clause alone is a sufficient predicate for liability.

Nor do we agree with the IAS Court's conclusion that the provision in which TNT agreed that "any of its employees whose services are required for successful completion of current assignment, will not seek or accept employment directly or indirectly" from Lucent for one year immediately following the ending of the contractual relationship between AIS and TNT is unenforceable because it "is not limited to a definitive time in which a former employee of TNT would be barred from competing for [AIS's] customers." The PSA does not bar former TNT employees from competing, nor does the clause seek to bind them to the terms of a restrictive covenant to which they did not agree. It merely places upon TNT the risk of TNT employees' defection with respect to the Lucent project and obligates TNT to protect itself (by obtaining non-competition agreements or otherwise) against that risk.

Moreover, this "open-ended" time restriction is not unreasonable under Connecticut law. "The five factors to be considered in evaluating the reasonableness of a restrictive covenant ancillary to an employment agreement are: (1) the length of time the restriction operates; (2) the geographical area covered; (3) the fairness of the protection accorded to the employer; (4) the extent of the restraint on the employee's opportunity to pursue his occupation; and (5) the extent of interference with the public's interests." (*Weiss & Assocs. v Wiederlight*, 208 Conn 525, 529, n 2, 546 A2d 216, 219, n 2.) While "a finding of unreasonableness in any one of the criteria is enough to render the covenant unenforceable" (*New Haven Tobacco Co. v Perrelli*, 18 Conn App 531, 534, 559 A2d 715, 717, *certification for appeal denied* 212 Conn 809, 564 A2d 1071), "[t]he mere fact that the duration of the restriction as to time is indefinite or perpetual will not of itself avoid the contract if it is limited as to place, and is reasonable and proper in all other respects." (*Cook v Johnson*, 47 Conn 175, 178.) Judged by this standard, the restriction as to time is reasonable. The restriction from seeking employment applies only to the client, i.e., Lucent, leaving the employee free, at any time, to accept employment from anyone else. The interests of the employee are thus protected since he is not precluded from pursuing his occupation. (*See, Scott v General Iron & Welding Co.*, 171 Conn 132, 137, 368 A2d 111, 114-115.) In addition, the restriction "afford[s] only a fair protection to the interest of [AIS] and [is not] so large in its operation as to interfere with the interests of the public." (*Id.*)

Defendants also urge as unreasonable the provision in the PSA prohibiting TNT, "for a period of one * * * year immediately following the ending of this contractual relationship * * * and within a radius of one hundred * * * miles," from disclosing any information pertaining to AIS's customers and from soliciting those customers. Contrary to defendants' contention that the agreement was terminated only when AIS's client determined that the project was satisfactorily terminated, the PSA, by its own terms, could be terminated by either AIS or TNT, upon 15 days notice.

Even if these provisions were found to be unenforceable, the other provisions of the PSA would remain in effect, since the PSA provided that "if any provision of this [a]greement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provisions

or the remaining provisions of this [a]greement." Thus, as noted, TNT would still be bound by its agreement, *inter alia*, that "[s]o long as the business relationship exists," it would not compete "directly or indirectly" with AIS. A breach of this provision alone would be a sufficient basis on which to hold Tee/TNT liable.

Finally, we note that certain causes of action, i.e., the second (for a declaratory judgment against TNT), fifth (violation of Connecticut's Unfair Trade Practices Act [Conn Gen Stat § 42-110a *et seq.*]), sixth (unjust enrichment), and ninth and tenth (breach and aiding and abetting breach of fiduciary duty), were properly dismissed. There is no basis for a declaratory judgment against TNT since the first cause of action for breach of contract affords AIS an adequate remedy. (*See, Apple Records v Capitol Records*, 137 AD2d 50, 54.) No claim under the Connecticut Unfair Trade Practices Act is stated since the special relief afforded by this act "requires, in a private dispute, the assertion of a public interest that is 'specific and substantial' " (*see, Ivey, Barnum & O'Mara v Indian Harbor Props.*, 190 Conn 528, 540, 461 A2d 1369, 1375) and no such interest is alleged. Nor does the complaint state a cause of action for unjust enrichment, since any benefit allegedly conferred upon defendant had nothing to do with services rendered by AIS under a contract. (*See, Hartford Whalers Hockey Club v Uniroyal Goodrich Tire Co.*, 231 Conn 276, 282, 649 A2d 518, 521; *see also, Garwood & Sons Constr. Co. v Centos Assocs. Ltd. Partnership*, 8 Conn App 185, 187, 511 A2d 377, 378-379.) The complaint also fails to state a cause of action for breach of fiduciary duty, since, as is apparent from the moving papers, no fiduciary relationship has been shown. The remaining causes of action are sufficiently pleaded.

Accordingly, the order of the Supreme Court, New York County (Charles Ramos, J.), entered January 24, 2000, which, insofar as appealable, denied plaintiff's motion for renewal, should be reversed, on the law, with costs and disbursements, the motion granted and, on renewal, defendants' motion to dismiss the complaint granted only as to the second, fifth, sixth, ninth and tenth causes of action and, except as thus granted, the motion to dismiss denied and the remaining causes of action reinstated. Appeal from order, same court and Justice, entered July 14, 1999, which granted defendants' motion to dismiss the complaint, should be dismissed, as academic, in view of the foregoing, without costs or disbursements.

Rosenberger, Tom, Andrias and Wallach, JJ., concur.

Order, Supreme Court, New York County, entered January 24, 2000, reversed, on the law, with costs and disbursements, the motion for renewal granted and, upon renewal, defendants' motion to dismiss the complaint granted only as to the second, fifth, sixth, ninth and tenth causes of action and, except as thus granted, said motion to dismiss denied and the remaining causes of action reinstated. Appeal from order, same court, entered July 14, 1999, dismissed, as academic, in view of the foregoing, without costs or disbursements.