MEMORANDUM OF DECISION
On December 1, 1999, the Department of Children and Families, hereafter "DCF," filed petitions for the termination of the parental rights of Juanita J., the biological mother of these three children. The petitions also included the fathers of the children, Jesus R., the father of Erica, Polo M., the father of Sixto and Michael B., the father of Mikia. The termination petitions allege that Juanita has failed to rehabilitate, so that she could parent her children, who were adjudicated uncared-for children in prior proceedings. Connecticut General Statutes § 17a-112 (j)(3)(B). They also allege that Juanita and all three fathers have abandoned the children and that there is no ongoing-parent child relationship between the biological fathers and the three children. Connecticut General Statutes § 17a-112 (j)(3)(A) and (D). All of the petitions further allege that the parents are unable or unwilling to benefit from reunification efforts. On June 22, 2000, Jesus R., Erica's father, filed a motion for revocation of her commitment, claiming that he was able to parent her and could have her in his care immediately. That motion was consolidated with the termination petitions for trial.
On December 13, 2000, at the start of the trial on the petitions, Michael B. consented to the termination of his parental rights. The court accepted his consent as knowingly and voluntary made with the advice and assistance of competent counsel. Trial continued on December 14 and concluded on December 20, 2000. Neither Juanita J. nor Polo M. attended the trial. Juanita's counsel did attend and participated in a limited manner as she had not heard from her client for some considerable time. At the close of DCF's case, Erica's father moved to dismiss the case, alleging that the State had failed to prove a prima facie case. Due to the facts found and for the reasons set forth below, the court denies the motion for revocation and grants the termination petitions for the parental rights of Juanita J., Jesus R., Polo M. and Michael B.
From the evidence presented, the court finds the following facts:
 A. FACTS
CT Page 3528 1. The mother, Juanita J.
Juanita is now thirty-five years old and is the mother of eight children, none of whom are in her care. Erica is the oldest of her children and was born on July 1986. She is a Downs Syndrome child. Sixto was born on March 1992 and is the fifth oldest of the children. Mikia, born on July 1997, is the youngest of the eight children. The remaining children are not subject to these proceedings. Juanita has been involved with DCF since 1992, due to her ongoing and significant substance abuse and consequent neglect of her children. Both Erica and Sixto were adjudicated neglected and committed to the care and custody of DCF in 1994 and 1993, respectively. Given the progress Juanita apparently made, they were returned to their mother in 1997. Less than a year after their return, on July 17, 1998, Juanita signed a voluntary placement agreement placing her children with DCF. Just before this time, there had been anonymous reports of Juanita's drug use and she had been in a shelter with the children. Some months after the children's voluntary placement, an OTC was granted on November 16, 1998 (Lopez, J.) The children were adjudicated uncared-for on June 30, 1999 and the termination petitions filed six months later on December 1, 1999. Whatever progress Juanita may have been able to make in 1997, she was unable to remain drug-free for any extended period of time. A psychological evaluation was conducted and a written report prepared by the court-appointed psychologist evaluator on March 4, 1999. She found that Juanita was functioning at the range of mild mental retardation and was:
 "dependent, has limited motivation, tends to avoid complexity, has difficulties in reality testing and is immature. She is self-centered. Her emotions are inconsistent in the way that they influence her behavior. She has problems controlling her emotional displays"[2]
A year later, on April 4, 2000, Dr. Augenbraun saw Juanita for an interaction session with her three children, after Juanita had missed two individual sessions. She reported that Juanita appeared to be under the influence of drugs and was unable to complete any psychological testing. Dr. Augenbraun noted in her report:
 "In my opinion, it would be detrimental to the interests of Sixto, Erica and Mikia to allow further time for the development of parent/child relationships. These parents have had sufficient time to resolve their problems and to provide plans for their children and have not done so. The children are languishing in foster care when they would benefit CT Page 3529 from stable adoptive homes.
 In the case of Ms. J., complete severing of the legal relationship . . . is clinically indicated, due to her ongoing drug abuse and the distress her visits appear to arouse in the children. There is more detriment than benefit to the children with visitation. Her presentation is often likely to be upsetting and her behavior inappropriate."[3]
Dr. Augenbraun's testimony at trial was consistent with her reports and her position had not changed regarding termination of Juanita's parental rights to all three children.
The DCF social worker reported that Juanita was incarcerated in 1998 and 1999 and her last contact with DCF was just prior to her release from incarceration on July 5, 2000. She has not heard from her since that time. As noted, Juanita did not attend the trial and her counsel was also not able to speak with her prior to trial. From the testimony, the court finds that Juanita has abandoned the children and had failed to rehabilitate so that she could parent them within any reasonable time, given their ages and needs. The court also finds this was so on the date of the filing of the termination petitions and their amendment on October 11, 2000. Juanita's drug abuse continued unabated through April, 2000 when she was unable to abstain to attend a court ordered evaluation session.
2. The absent father, Polo M.
Polo has never been involved with his biological son, Sixto, and has had no contact with DCF concerning this child. He has not inquired about the child's welfare, sent cards, letters or gifts. He also does not have an ongoing parent-child relationship with Sixto. He has never had court expectations set for him nor counsel appointed to represent his interests, due to his absence. For those reasons, no services were ever offered to him. From the clear and convincing evidence, the court finds that he had abandoned his child.
3. Erica's father, Jesus R.
The trial of these termination petitions centered primarily on whether or not Jesus R.'s rights to his daughter should be terminated, which he, through his counsel, opposed. Jesus is now thirty-nine years old and has been gainfully employed for a number of years. In 1992, when the first difficulties Juanita had with DCF began, he was no longer involved with the family. He had been incarcerated at that time, due to drug-related CT Page 3530 crimes, and he is a convicted felon. Nonetheless, once released from incarceration, he managed to rehabilitate himself as a useful and productive citizen. By all accounts, he has remained drug free since 1993 and has had no further involvement with the criminal justice system. He has resided for several years with his girlfriend and her three children. Unlike Juanita, his life course has significantly improved in the years since 1992.
When Erica came into DCF care the second time in 1998, Jesus had not been actively involved in her life, although he had been visiting. When DCF first contacted Jesus about Erica, he was living in a YMCA, having suffered financial reverses because of medical bills. He said he would be able to make a home for Erica in about four months. During this contact in November, 1998, the DCF worker testified that she told him that he needed to secure stable housing for himself adequate to accommodate Erica, have a substance abuse evaluation and attend parenting classes. The substance evaluation was performed in February, 1999 and found, based on his self-report, that Jesus R. had been able to remain drug free since 1992. No further treatment was then recommended.
The DCF narrative reflects a face-to-face meeting between the next social worker assigned to the case, Cynthia Pfeiffer, and Jesus on March 30, 1999. At that time, the narrative reflects that he was still living at the YMCA. The narrative states:
 "This worker explained that suitable housing is an important to facilitate reunification. Worker discussed other services that were recommended. They include 1) educational and support classes to learn about Downs Syndrome and caring for a child with specialized needs, 2.) devising a plan for day care before and after school, 3.) attending therapy to deal with Mr. R. "s issues. Mr. R. was very open and receptive to all recommendations. He expressed wanting to be reunified with his daughter and committed to this plan."[4]
At that time, the worker also discussed with him the findings of the psychological evaluation performed by Dr. Augenbraun and his interactional session with his daughter. That evaluation recommended that he might benefit from individual counseling.
A. The Psychological Evaluations
Erica and Jesus R. were evaluated a number of times by a court-appointed psychologist. The reports of Dr. Augenbraun were CT Page 3531 introduced into evidence and she herself testified in detail concerning those findings. As to Jesus, her evaluation concluded that:
 "he is in a state of chronic stimulus overload which can reduce his ability to deal with stress . . . His chronic problems promote perceptual inaccuracy and contribute to difficulties in maintaining an adequate adjustment. He is uncomfortable around emotions and can have a negative, angry attitude, though he did not display this during this evaluation."[5]. . . .
She also found that "he has indicated a desire to have custody. He does not currently have a suitable residence. He may minimize his daughter's deficits."
She conducted a second interaction session with him and Erica on April 4, 2000. At that time, she reported that "There was appropriate hugging and Erica was affectionate with him." Nonetheless, she found:
 "his communication at times did not appear to be understood by Erica. At times he appeared to have difficulty understanding her and he was limited in his ability to rephrase questions and to rethink his questions to elicit useful information from Erica." At times, his manner of playing with her seemed to be testing her or designed to demonstrate his ability vs. hers."[6]
She also noted that a year after the first evaluation, Jesus R. was unfamiliar with Erica's current circumstances and has not kept in contact with her. In her case summary dated 4/14/2000, Dr. Augenbraun wrote:
 "Mr. R. is functioning intellectually in the lower portion of the average range. . . . Personality factors affect his relationship with others. He avoids challenging situations and he has not followed through on services needed and arrangements that had to be made before Erica could be placed in his custody. He does not appear to have a realistic plan for her."[7]
At trial, she testified to the same conclusions. She stated:
 "I believe that he seeks simple solutions to complex problems and prefers a rather simple life which he has created for himself. I relate this to his ability to care for a teenage Downs Syndrome child."
CT Page 3532
She noted that having such a child requires special attention in securing the needed services. She stated that such a child:
 "requires a higher level of support and a longer level of support to meet her special needs. There are school personnel to deal with, PPTs to attend, making sure that she gets all the services she needs, planning for the future, after school care and more help with the activities of daily living and ordinary living."
She noted that Erica will require continued support for her whole life.
When questioned about Jesus's ability to care for Erica, Dr. Augenbraun provided her opinion that:
 "Jesus was not best suited to care for Erica on a day-to-day basis. She needs a stable, secure situation with a family that can be attentive to her needs, secure services, foster her growth and support her as a young adult and find and use available opportunities that there are for the developmentally delayed."
When questioned about his underlying personality characteristics and how he might overcome them, Dr. Augenbraun noted: "I am not sure that anything would change long term underlying personality characteristics. There is a rather slim likelihood of a major change in a adult." When questioned whether her opinion would change if Jesus had had such treatment, she stated that "if he had taken the initiative to seek out services and was compliant with treatment, that would have been a positive sign, but this did not happen." And indeed, there is no evidence that it did.
At trial, the evaluator had not changed her opinion. She testified that it would be detrimental to allow further time for the development of a parent child relationship, since the parents had had sufficient time to do so and had taken no such steps while the children were languishing in foster care. She also did not believe, in response to questions on cross-examination whether it would have an adverse impact on Erica to sever her relationship with her father, that this was so. She noted that Erica was limited in her ability to think about long-term situations and that she was more likely to be occupied by day-to-day things.
Shortly before trial, Jesus R. and Erica were evaluated by an independent psychologist of Jesus R.'s own choosing. Dr. Marsha Cohen testified at trial that she had conducted an interaction session between CT Page 3533 Jesus and Erica. She had received and reviewed Dr. Augenbraun's evaluations and other material. She, too, noted the difficulties Erica had in speaking. She observed that Erica's speech is sometimes very clear and that "this would be followed by a burst of very slurred speech." She wondered whether the child could not hear well or whether there were other complications. She believed that further testing of the child was warranted. She noted that during the session, Erica was in a "good mood and had good self-esteem." She noted the child's simple concrete thinking. She observed that Jesus was sensitive to Erica's needs. She was of the opinion that Erica had positive memory and feelings for her biological father. She testified that if Erica could no longer see her father, this would be devastating to her.
In her session and assessment, Dr. Cohen attached great significance to the fact that Erica, when given two pieces of paper on which to draw her foster father and her biological father, only drew a picture of Jesus. Dr. Cohen was unaware, until after her assessment was completed that Erica had no foster father in her foster home, but only a foster mother and other children. She concluded from what she saw and heard, since Erica did not spontaneously speak of her foster mother, that Erica was not attached to her foster family. She also admitted that she "could not help but identify with the child."
Most damaging to the validity of Dr. Cohen's opinion were her beliefs about termination of parental rights. She admitted that in her opinion, if a child was not physically abused and if that child knows who her parent is and recognizes that person and has some affectionate feeling, a termination of parental rights should not be granted. Further, under these circumstances, it did not matter to her whether or not the child had been in foster care.[8] While this is a point of view that the court can appreciate and understand, it is a parent-focused point of view. It does not examine what is in the child's best interest and whether or not the length of time a child has been in foster care should be considered, as prolonged stays may be detrimental to a child. For these reasons as well as the conclusions drawn on the basis of faulty assumptions, the court rejects Dr. Cohen's opinion.
B. Court Expectations, Services offered and Jesus R.'s Completion of them
The DCF social workers testified that Jesus R. had never completed the steps necessary for reunification. Indeed, they claim that the first requirement of having stable housing sufficient to provide for Erica has not been met. Jesus challenges all of the assertions. He maintains that that he has stable housing with his girlfriend. There is no dispute that DCF has never viewed this home and only knows a post office box address for Mr. R. When questioned about services offered to assist with CT Page 3534 housing, DCF admits no such service was offered, as Mr. R. spoke of the need to earn more money before he could establish a home for himself and Erica. Now, the evidence is clear, he together with his girlfriend have established a home where they reside together with her three children, none of whom are his biological children. The evidence is also clear that Jesus has never made that home nor its occupants available to DCF for further investigation. Indeed, by keeping the physical street address hidden, it would appear that he has carefully separated himself and his new family from DCF scrutiny and the court so finds.
As earlier noted, there is no evidence that Jesus R. has arranged for the necessary day care, learned more about the care required for Downs Syndrome children or involved himself or his new family with a Downs Syndrome support group. He has opted, as Dr. Augenbraun noted, for a simple and contained life. He works six days a week from early in the morning until late in the day. He, personally, would not have the time to provide the care Erica requires. While this is not required of him, he has also not made the necessary arrangements necessary that are required for this special needs child.
Given the procedural history of this matter, the original neglect petition ended with a return of the children to their mother in 1998 under an order of protective supervision. In that case, on March 4, 1997, court expectations were set for both parents. Among the requirements for Jesus were the obligations to keep appointments with DCF, to visit Erica as much as possible, and to participate in a Down's Syndrome support group. As previously noted, this is something that was repeated to him by the DCF social worker in 1999, some months after the children had been again removed from their mother on an order of temporary custody in October, 1998. In the neglect case filed at that time, no new court expectations or specific steps were issued. Nonetheless, the court finds, both from the record and the testimony, that Jesus R. was aware of the recommendations made to him by DCF.
Visitation was difficult to arrange between Jesus and Erica. His six-day work schedule made it impossible to schedule time during the ordinary DCF workweek. The DCF record and the social worker testimony demonstrates that DCF managed to arrange for one weekend visitation session in April, 1999 and that the foster mother was amenable to considering further visitation in a neutral place. At that time, a new social worker was assigned to the case, who did not contact Jesus and introduce herself to him and review the status of the case, as is the DCF protocol. Inexplicably, there were no further communications between Jesus R. and DCF concerning visitation until April, 2000, fully a year later, after the termination petition was filed, at which time Jesus and his sister presented themselves to DCF as resources for Erica. CT Page 3535
Jesus claims that DCF had the burden to provide him with such visitation, which was the only service they were then providing to him. He claims that DCF's failure to take any action on Jesus's behalf demonstrates that DCF has failed to make out a prima facie case. He claims that he is ready, willing and able to care for Erica now and that the termination petition against him must be dismissed.
There is evidence of some phone calls by DCF during this year-long silence regarding further visitation, but there were no return calls by Jesus to ask for visitation or to inquire about Erica's welfare. There were no cards, letters or gifts sent. The last DCF narrative in 1999 notes after the weekend visitation that Jesus is to call to arrange for further such visitation with Erica through the foster mother. There is no evidence that he did so. A year of no contact is a very long time in a child's life, even a child that was then eleven and twelve years old.
DCF's failure to contact Jesus for a period of one year demonstrates a complete lack of attention on the part of the social worker to her required duties.[9] Nonetheless, such a social worker failure does not, without more, mandate a dismissal of the termination petition. Had Jesus completed all the steps required of him during this period of time, had he called to make further weekend arrangements, had he inquired about Erica, the court would agree with his claim. But he also avoided dealing with this difficult situation and when he next contacted DCF a full year later, he offered his sister as a resource to care for Erica. The message such an offer sends is that Jesus was not yet prepared in June, 2000 to have this child in his care.
Since then, to his credit, Jesus has begun to regularly visit with Erica. Jesus has been visiting with Erica approximately twice a month since July 18, 2000. His visits have been consistent. Jesus appears to have a good relationship with Erica, as has been noted.
4. The Three Children
 A. Erica R.
Erica has been in her present foster home for a total six years, although, given her brief return to her mother in 1997 and 1998, not for one continuous period of time. She views the other children in the household as her siblings and she has a very positive relationship with her foster mother. She appears to be very happy there. Her present DCF social worker reported that her school reports that she is functioning at the highest level which can be expected of a Downs Syndrome child. Her foster mother wishes to adopt her, should she become available for CT Page 3536 adoption.
B. Sixto
Sixto has had the same experience as his sister and had remained in the same foster home for a considerable length of time. When born in 1992, he tested positive for the presence of cocaine and marihuana in his system. He was provided with services to address the speech and language delays he has had. He began school as a special education student and has now been main-streamed. He has stabilized there and done well in his foster home and his foster mother wishes to adopt him, should he become available for adoption.
C. Mikia
This child, now age three, is in a foster home with two foster parents, and other children. She regularly attends daycare. She has a very good relationship with the other children in the home, who treat her as their little sister. Her foster parents wish to adopt her, should she become legally adoptable.
 B. MOTION TO DISMISS
At the close of DCF's case, Jesus R.'s counsel orally moved to dismiss the petition as to Erica, claiming that DCF had failed to establish the legal requirements for the claims presented. The court took the motion under advisement. Connecticut Practice Book (Rev. 1998) § 15-8
permits the court to dismiss a case "whenever it determines that, after the plaintiff has produced his evidence and rested his cause, the plaintiff has presented insufficient evidence to establish a prima facie case against the defendant." Season-All Industries, Inc. v. R.J. Grosso,Inc., 213 Conn. 486, 493, 569 A.2d 32 (1980). In considering and ruling on a motion to dismiss, the court must determine whether "sufficient evidence has been submitted to raise an issue to go to the trier of fact." New England Savings Bank v. Bedford Realty Corp., 246 Conn. 594,608, 712 A.2d 713 (1998). "The evidence must be such that, if credited, it would be sufficient to establish the fact or facts it is introduced to prove." Berchtold v. Maggi, 191 Conn. 266, 270, 464 A.2d 1 (1983). In evaluating the motion, the plaintiff's evidence "is to be taken as true and interpreted in the light most favorable to [the plaintiff], and every reasonable inference is to be drawn in [the plaintiff's] favor." AngeloTomasso, Inc. v. Armor Construction and Paving, Inc., 187 Conn. 544,548, 447 A.2d 406 (1982). "A plaintiff has failed to make out a prima facie case "when the evidence produced by the plaintiff, if fully believed, would not permit the trier in reason to find the essential issues on the complaint in favor of the plaintiff." Rosenfield v.CT Page 3537Cymbala, 43 Conn. App. 83, 91, 681 A.2d 999 (1996), citing Minicozzi v.Atlantic Refining Co., 143 Conn. 226, 230, 120 A.2d 924 (1956).
The respondent claims that DCF has failed to establish a prima facie
case on both grounds alleged. Viewing the evidence in the light most favorable to DCF, the court cannot conclude that this is so. DCF has proven a prima facie case on all grounds against Jesus R., and the court therefore denies the motion.
 C. MOTION FOR REVOCATION OF COMMITMENT
Jesus filed a motion for revocation of Erica's commitment to DCF, which was consolidated with the termination petitions for trial. He argues that the original causes for that commitment no longer exist. He maintains that he can care for the child now. Jesus further claims that he has done all the things he needs to do. The court does not agree. He has not made adequate care arrangements for her. His housing situation and the extent to which he controls it is unknown. He has not considered the difficulties which would arise in integrating a significantly handicapped child into a pre-existing and unrelated sibling group. He has not familiarized himself with the extraordinary needs of Down's Syndrome children.
Connecticut General Statues § 46b-129 (m) provides that:
 "Any court by which a child. . . . has been committed pursuant to the provisions of the section, may, upon the application of a parent. . . . upon finding that cause for commitment no longer exists, revoke such commitment. . .".
The case law has held that:
 "The burden is clearly upon the persons applying for the revocation of commitment to allege and prove that the cause for commitment no longer exists. Once that has been established, the inquiry becomes whether a continuation of the commitment will nevertheless serve the child's best interests. . . . . . . . The court, in determining whether cause for commitment no longer exits, would obviously look to the original cause to see whether the conduct or circumstances that resulted in commitment continue to exist . . . The trial court, thereafter, "may consider if any cause for commitment still exists." (Internal citations and quotations marks omitted.) In re Cesar G.,
CT Page 3538 56 Conn. App. 289, 292, 293, 294, 742 A.2d 428, (2000).
As indicated, the court does not quarrel with the fact that Jesus has left his old life behind. He is drug-free and employed. But more is required to be a responsible parent for Erica and these steps he has not taken.
Further, even if the court concludes that there are no causes for commitment remaining, the court is required to consider whether or not a continuation of the commitment will nevertheless serve the child's best interest. As was stated In re Thomas L., 4 Conn. App. 56, 57, 492 A.2d 229
(1985):
 On this point, when it is the natural parents who have moved to revoke commitment, the state must prove that it would not be in the best interests of the child to be returned to his or her natural parents." (Internal citations omitted).
As set forth in detail below, the court cannot find that it is in Erica's best interest to be returned under these circumstances to her biological father.
 D. ADJUDICATORY TERMINATION FINDINGS 1. Reasonable Reunification Efforts.
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that it "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts . . ." Connecticut General Statutes § 17a-112 (j)(1). The petitions allege that Juanita, Jesus R. and Polo M. are unwilling and unable to benefit from reunification services. The court finds from the clear and convincing evidence that neither Juanita nor Polo M. have done so. As to Jesus R., the court finds, based on his past history with DCF, the services, which were provided, were reasonable. In his case, those services were visitation and case management services. He never requested assistance to locate a Down's Syndrome support group or the individual counseling suggested by Dr. Augenbraun, which were recommended for him. In all this time, Jesus has not be able to adequately prepare to parent his special needs child.
2. Adjudicatory findings
CT Page 3539
A. Juanita J.
The termination petitions allege that Juanita has failed to rehabilitate, so that she could parent her children, who were adjudicated uncared-for children in prior proceedings. Connecticut General Statutes § 17a-112 (j)(3)(B).
All three children were adjudicated uncared-for children on June 30, 1999 and were committed to the care and custody of DCF. The court further finds, by clear and convincing evidence, that as of December 1, 1999, Juanita had not achieved such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the ages and needs of her children, she could assume a responsible position in their lives. She failed to participate in the services offered to address her issue. She did not demonstrate ongoing care and concern for her children nor do anything to rehabilitate.
"Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent." In re Migdalia M., 6 Conn. App. 194, 203, 504 A.2d 532
(1986), see also; In re Juvenile Appeal, 1 Conn. App. 463, 477,473 A.2d 795 (1984). The statutory framework requires the court to analyze the parent's rehabilitation "as it relates to the needs of the particular child" and consider if such rehabilitation is foreseeable "within a reasonable time." In re Luis C., 210 Conn. 157, 1167,554 A.2d 722 (1989), In re Hector L., 53 Conn. App. 359, 366-367,730 A.2d 106 (1999). Because of this requirement that the court predict what may happen within a "reasonable time" after the filing of the termination petitions, the court must consider not only Juanita's conduct prior to the filing of the petition, but also her conduct since that time. In this case, this was a period of over one year, during which time there has been no change.
The petitions also allege that Juanita has abandoned her children, which the court finds from the clear and convincing evidence.
B. The allegations against Polo M. and Jesus R.
The petitions as they relate to Polo M. and Jesus R. allege that they have abandoned their children. Connecticut General Statutes § 17a-112
(j)(3)(A) and (D). "Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare." In re Juvenile Appeal (Docket No. 9489), 183 Conn. 11,14, 438 A.2d 801 (1981). Abandonment focuses on the parent's conduct. Inre Michael M., 29 Conn. App. 112, 614 A.2d 832 (1992); In re Rayna M.,
CT Page 354013 Conn. App. 23, 36, 534 A.2d 897 (1987); In re Kezia M.,33 Conn. App. 12, 632 A.2d 1122 (1993). "Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of "interest, concern or responsibility for the welfare of a child." In re Luke G., 40 Conn. Sup. 316, 323, 498 A.2d 1054
(1985). "Maintain implies a continuing, reasonable degree of concern. Inre Migdalia M., 6 Conn. App. 194, 210, 504 A.2d 532 (1986). The court finds from the clear and convincing evidence that Polo M. has abandoned his son. He has never been involved in his son's life and has shown no interest in him.
As to Jesus R., he has shown some interest in his daughter through his requests to visit her. The court notes that when the termination petition was filed on December 11, 1999, he had not then visited with her or had any contact with DCF since May, 1999, a period of approximately seven months. From November, 1998 to July, 2000 Jesus tried to visit Erica three times, and visited twice as she was sick on one occasion. From May, 1999 until July, 2000, he visited not at all and did not call to request visits. "This is not a "continuing, reasonable degree of concern." While the court acknowledges that it was difficult for him to visit and that the new DCF social worker did not contact him to make her identity known, the record also reflects that after months of efforts to set up visits, Jesus himself did not take any steps for further visitation after his first weekend visit in 1999.
The court finds, from the clear and convincing evidence, that within the time frame to be measured, the time leading up to the adjudicatory date of October 11, 2000, Jesus R. showed only sporadic interest in his child. It was not until July, 2000, when he understood that the termination was proceeding, that he was able to arrange regular visits. For a period of a year prior to that date, he did not call to inquire about her, visit with her, or send her cards, letters or gifts. While he has since demonstrated his willingness to visit with her, his interest in her fails to demonstrate the level of responsibility for her that a parent must show. Simply saying he wishes to care for her is not what is required. He must, as all parents must, set aside his own immediate needs and interests, and take action which might otherwise not be comfortable for him, to show a parental concern for the child. This he has failed to do throughout the pendency of these actions. The court concludes, from the clear and convincing evidence, that he has abandoned his child within the legal meaning of the term.
DCF has alleged a second ground for the termination of the Jesus's parental rights, which is that there is no ongoing parent-child relationship between him and Erica. Erica does recognize her father as her biological father and appears pleased to see him. In the opinion of CT Page 3541 Dr. Augenbraun, this is nothing more than a visiting relationship with Erica. She was also of the opinion that to permit further time for the establishment of a parent-child relationship between them would be detrimental to Erica. The court accepts and is persuaded by her opinion and testimony.
In considering the question posed concerning the lack of a parent-child relationship:
 "The court must first make a determination that no parent-child relationship exists and then, if that is so, it must determine if, in the future, the child's best interest would not be served by allowing time for the establishment or reestablishment of the relationship." In re Migdalia M., 6 Conn. App. 194, 211, 504 A.2d 532 (1986)
The court finds that there exists a pleasant visiting relationship between Erica and her biological father. Because of Erica's disability, it is hard to know what memories this child retains of her father, although she is able to recognize and respond to him. The court is persuaded by Dr. Augenbraun's view that Erica, like other children with her disability, is a child who thinks concretely and lives from day-to-day. The future as it stretches out in front of her is not something she does or is likely to contemplate. The court finds, from the expert testimony, that the severance of the ties between them will not have an adverse impact on the child. The court also finds that it is detrimental for Erica to wait longer for permanency, which Jesus, despite his intentions, has not been able to adequately arrange for her, given her specialized needs and care requirements. The court finds, from the clear and convincing evidence, that there is no longer an ongoing-parent child relationship between Erica R. and her biological father.
 E. REQUIRED FINDINGS
The court makes the following factual findings required by Connecticut General Statutes § 17a-112 (k), noting that none are required for Michael B., who has consented to the termination of his parental rights.
1) Appropriate and timely services were provided by DCF to the family. These include services to benefit the children, referrals for Juanita to deal with issues of parenting, as well as substance abuse treatment . . . Limited services were also, as detailed above, provided to Jesus. DCF also provided visitation and case management services to the parents.
2) As previously noted, the court finds by clear and convincing CT Page 3542 evidence, reasonable reunification efforts were made by DCF and that the parents were unable to benefit from them.
3) The terms of any applicable orders entered into and agreed to by any individual or agency and the extent of fulfillment of those obligations. The court finds that reasonable court expectations were set for both Juanita and Jesus in the earlier neglect proceedings which ended in the brief return of the children to their mother. None were set in the present proceedings, given the nature of the various issues then pending. None were set for Polo M., as he never participated in any proceedings.
4) The feelings and emotional ties of the child with respect to the parent, any guardian of the person and any person who has exercised physical care, custody and control of the child for at least one year and with whom the child has developed significant emotional ties. The court has detailed that all of the children are doing well in their foster homes and are attached to their foster families. Erica and Sixto have resided with their foster families for almost six years and Mikia for almost three.
5) Finding regarding the age of the children: Erica is fourteen years old, Sixto is nine and Mikia is three years old and will be four on July 15 of this year.
6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions to make it in the best interests of the child to return him to their home in the foreseeable future and (A) the extent to which the parents have maintained contact with the child as part of an effort to reunite the child with them, provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the child. As detailed above, the court finds that Juanita and Polo M. have not made necessary changes in their lives to care for their children. Jesus has made some changes, but not those changes, which would permit him to provide the care that his Down's Syndrome teenage daughter requires.
7) Finding regarding the extent to which a parent has been prevented from maintaining a reasonable relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parents. No such conduct is noted. DCF took steps for a number of years to assist this family. While it can be argued that financial pressures made it difficult for Jesus to care for Erica, those pressures have lessened in the past years, but he has still failed to focus on Erica's care requirements and arrange to meet them. CT Page 3543
 F. DISPOSITION
In hearing a termination of parental rights case, the court must first determine whether or not the grounds for termination have been proven by clear and convincing evidence. If so, only then may it consider what action is in the best interests of the child at issue.
 "A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interests of the child." (Citations omitted; internal quotation marks omitted.) In re Danuael D., 51 Conn. App. 829, 835-37, 724 A.2d 546
(1999).
The court has found that the grounds alleged against the biological parents of these three children have been proven by clear and convincing evidence. Mikia's father has consented to the termination of his parental rights. The court has made the seven statutory findings required, which all weigh in favor of termination being in these children's best interests. The court concludes, from the clear and convincing evidence that they cannot wait any longer for permanency.
In another context, the court has described what defines an appropriate custodial placement:
 "The award of custody requires the trial court to make difficult and sensitive inquiries between the relationships between adults and children. In the search for an appropriate custodial placement, the primary focus of the court is the best interests of the child, the child's interest in sustained growth, development, well-being, and in the continuity and stability of its environment." Cappetta v. Cappetta, 196 Conn. 10, 16, 490 A.2d 996 (1985).
This description summarizes what can and should be seen as some of the factors that relate to what it in the best interests of children. Further, our courts have noted the "deleterious effect of prolonged CT Page 3544 temporary care of abused and neglected children." In re Juvenile Appeal(84-CD), 189 Conn. 276, 455 A.2d 1313 (1983). In addition, "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ." In re Alexander V.,25 Conn. App. 741, 748, 596 A.2d 930 (1992). The court concludes, from the clear and convincing testimony, that it is in the best interests of Erica R., Sixto M. and Mikia B. to have permanency and stability in their lives. Accordingly, the court further finds by clear and convincing evidence that it is in their best interests that their parents' rights to them be terminated.
The court therefore orders that a termination of parental rights enter terminating the parental rights of Juanita J., Polo M., Michael B. and Jesus R. The children's foster care providers have all expressed unequivocal desires to adopt the children in their care. The court directs that they be given first consideration in any adoption, as is presently the DCF plan for these children. The court appoints the Commissioner of the Department of Children and Families as the statutory parent. The court further orders that a permanency plan for Erica, Sixto and Mikia and a review plan for them be filed in accordance with state and federal law.
Barbara M. Quinn, Presiding Judge Child Protection Session